## WICK O'CONNELL and Another v. MICHAEL WARD and Others.[1]

July 23, 1915.

Nos. 19,143—(90).

**Contract — parol evidence to explain ambiguity.**

1. The language of a written contract for the cutting and delivery of logs was ambiguous, and the court properly received verbal testimony of the surrounding circumstances for the purpose of determining its meaning.

[1] Reported in 153 N. W. 865.

**Same — question for jury.**

2. There was some conflict in this testimony and the court properly submitted the question of construction of the contract to the jury.

**Charge to jury.**

3. The court properly instructed the jury as to the manner of arriving at the amount of logs cut and delivered.

**Evidence.**

4. The evidence sustains the finding of the jury as to such amount.

**Impeachment of witness.**

5. A letter by a witness reflecting on the character of a scaler who had scaled most of the logs in controversy was offered as impeachment of the testimony of the writer. The witness had not vouched for the character of the scaler, nor had he, except vaguely, corroborated his scale. *Held,* the rejection of the letter was not error.

**Log and logging — evidence of quantity.**

6. Evidence as to the number of logs several years before the cutting and of the amount still standing was properly received as having some bearing on the amount cut.

Action in the district court for Lake county by the partners doing business under the firm name of Wick O'Connell & Co. against Michael Ward and Munroe, Boyce & Co. to recover $27,814 for a balance due upon a logging contract. The case was tried before Fesler, J., and a jury which returned a verdict for $29,793. From an order denying their motion for a new trial, defendants appealed. Affirmed.

*Baldwin, Baldwin & Holmes,* for appellants.

*O. J. Larson, M. E. Louisell* and *Theodore Hollister,* for respondents.

HALLAM, J.

This action, so far as material to this appeal, is brought to recover a balance due on a logging contract made in September, 1910, as modified by a later contract made in December, 1911, by which plaintiffs agreed to cut certain timber and deliver the logs into Mountain Iron lake. By a third contract plaintiffs agreed, for 60 cents a thousand, to drive the logs from Mountain Iron lake into Basswood

lake. From there they were conveyed by other parties to the mill where they were sawed.

The original logging contract provided for the cutting within three years of the timber standing upon certain tracts of land, at a price of $6.75 per thousand feet, payable "fifty per cent when said logs are skidded and the balance when said logs are delivered on the banks of said lake," the logs to be scaled by a scaler to be chosen by the parties. As scaler, the parties selected S. B. Gerard, a deputy surveyor general of the state. His services were later dispensed with and Paul W. Keating, another deputy surveyor general, substituted in his stead. The disputed questions in the case center around the scale made by Gerard.

The modified contract recited that the parties "desire to modify said original contract with reference to the terms of settling for the cut of 1911–1912;" and provided for payment "fifty per cent of the contract price when said logs are skidded, and forty per cent when said logs are delivered at Mountain Iron lake * * * the parties of the second part retaining ten per cent of the agreed price for the cutting and delivery of said logs until final settlement is made. Said ninety per cent is to be arrived at from the scale made by the scaler in the woods as said logs are gotten out, * * * final settlement is to be made * * * on the mill scale of grades known as No. 4 and better at the end of the manufacturing season."

The discrepancy between the scale in the woods and the mill scale for the season of 1911-1912 was tremendous. The scale in the woods showed 101,827 logs containing 14,440,880 feet of lumber of the required grade. The mill scale showed 74,899 logs containing 5,962,389 feet of lumber. On the basis of the scale in the woods plaintiffs earned $106,140.46. Seventy-nine thousand, three hundred forty two dollars and sixty-two cents has been paid, and they claim a balance on this account of $26,797.84. On the basis of the mill scale plaintiffs earned only $42,003.39, and they have been overpaid $37,339.23, and defendants counterclaim for this amount. The jury gave plaintiffs the full amount of their claim, and, by so doing, in effect sustained the woods scale.

1. The parties disagree as to the proper construction of this modified contract. Plaintiff contends that 90 per cent of the price

was to be paid on the woods scale absolutely and without reservation, and at the end of the manufacturing season a final payment was to be made if the mill scale showed more than 90 per cent of the woods scale, but that nothing was to be paid back by plaintiffs if the mill scale underran the woods scale. Defendants, on the other hand, contend that the entire amount was to be paid on the mill scale; that the payment of 90 per cent was an advance made provisionally; that the final accounting was to be had at the end of the manufacturing season on the basis of the mill scale, and if the amount theretofore paid exceeded the amount earned according to the mill scale plaintiffs would repay any such excess.

The trial court considered the language of the contract ambiguous. In this the court was right. In all probability the parties did not contemplate that there would be such a discrepancy between the two scales. They probably did not expect that the mill scale would show less than 90 per cent of the amount shown by the woods scale, at least they provided but meagrely for such a contingency.

The language being ambiguous, the court received verbal testimony as to surrounding circumstances, including the prior negotiations between the parties, for the purpose of determining the intent and meaning of the ambiguous language of the contract. This was proper. Sandretto v. Wahlsten, 124 Minn. 331, 144 N. W. 1089. The amount involved was large, exceeding, according to plaintiffs' contention, $100,000. A large part of the logs had already been cut and scaled and a large part of the consideration paid. The modified contract gave plaintiffs no control over the mill scale and no voice in the selection of the scaler. But little attention was paid by either party to the mill scale. In fact there was no mill scale that was worthy the name, nothing but a rough estimate by the various employees at the mill. All these facts tend to show that it was improbable that the parties should have intended to stake everything on the mill scale. On the other hand, defendants claim that the modified contract was prompted by the fact that a check had been made of Gerard's scale and had shown its inaccuracy, and by the fact that results at that time showed that his scale during the previous year had been inaccurate, and that these facts and the nego-

tiations at the time the modified contract was made clearly indicate that the mill scale was thereafter to be the only basis of computation.

2. There was some conflict in this verbal testimony. The construction of this ambiguous language, in the light of the surrounding circumstances, was accordingly proper to be submitted to the jury. T. R. Foley Co. v. McKinley, 114 Minn. 271, 274, 131 N. W. 316; Blocher v. Mayer Bros. Co. 127 Minn. 241, 149 N. W. 285. The trial court submitted the question of construction of the contract to the jury, with proper and clear instructions. The verdict of the jury was in accordance with plaintiffs' contention, and it is sustained by the evidence.

3. The remaining questions of law in the case are easy of solution. The defendants, in their second request for instructions, in substance asked the court to charge the jury as a matter of law that, under the modified contract, the mill scale controlled. The court refused this instruction and defendants, in their third request then asked that the court give the following instruction:

"You are instructed that the plaintiffs are entitled to $7.35 per thousand feet of grade 4 or better for all logs actually cut and delivered into Basswood lake during the season of 1911 and 1912. If the scale made in the woods correctly expresses that amount, you will base the amount earned by the plaintiffs on that scale. If the scale made at the mill correctly expresses the amount so cut and delivered, you will base the amount earned by the plaintiffs on that scale. If neither of these scales correctly expresses the amount so cut and delivered, you will arrive at the correct amount from all the evidence in the case which tends to show that amount." In other words, defendants' position was that, if the mill scale was not, as a matter of law, controlling, then the amount of the cut should be determined from all the evidence in the case. Plaintiffs assented to the third instruction, and it was given. Upon that instruction the jury found that the amount of the cut as claimed by plaintiffs was correct.

4. The only remaining question is, does the evidence sustain this verdict? We are of the opinion that it does. We have been impressed with the importance of this question on account of the wide

discrepancy in the testimony. With such discrepancy existing, the injustice that may be done by a wrong decision is substantial. While the evidence on the part of plaintiffs falls far short of certainty, yet we cannot avoid the conclusion that it is sufficient to sustain the verdict of the jury. Mr. Gerard, who made the woods scale so far as it is here questioned, was a scaler of considerable experience and a public official of the state. Both parties knew him and agreed upon him. His scale sustains all the contentions of the plaintiffs. There is some other evidence corroborating his scale. There are also some facts which, in a measure, explain the discrepancy in the two scales. It is clear that some logs were lost between the time plaintiffs delivered them in Basswood lake and the time they reached the mill and, as stated above, the mill scale was only an estimate. It is difficult, even after making allowance for these facts, to account for the difference between the estimate at the mill and the scale in the woods, except on the hypothesis that one or the other was wrong. The question as to which was right and which was wrong involves only questions of fact, and there is sufficient evidence to sustain a verdict in favor of the contentions of the plaintiffs.

5. Exception is taken to a refusal of the court to receive in evidence a letter written by Keating reflecting on Gerard. The letter was offered on the cross-examination of Keating and for the purpose of impeaching his testimony. As far as here material, it reads as follows:

"I am not at all surprised at the outcome of the logs Gerard scaled. It would surprise me if the work was done half right. You know I followed him on another job last spring after I left up there. I learned things about him then that convinces me that he is a natural born crook. It is too bad that such a fellow should be in a position to rob a man openly. I am satisfied that if a competent scaler had started in there and done right that there would not be one word of controversy."

The sole purpose of offering the letter was to impeach the testimony of Keating. Clearly where a witness testifies as to facts, evidence that on a prior occasion he gave a different version of the facts is admissible for purposes of impeachment. And if the wit-

ness gives opinion evidence, then evidence that, on a prior occasion, he gave a different opinion is admissible to impeach him. Smith v. Standard L. & A. Ins. Co. 80 Minn. 291, 83 N. W. 342; Beaubien v. Cicotte, 12 Mich. 459. But these rules have no application here. Keating had given no opinion as to Gerard's character, and he had been asked for none. He had not given any opinion as to the verity of Gerard's scale. He had given "an estimate" as to the number of logs that Gerard had scaled. The estimate was vague and of little consequence. He gave it by consent of both parties after he stated that he wasn't there to make an estimate of any logs but his own, and after he had said "whether or not I could give an intelligent answer I don't know." The opinion he gave was that the number scaled by Gerard was "four and a half, possibly—well five times as many logs as I had." He later said, "I believe maybe four—maybe four and a half, as I remember it. Now I don't know whether that is the actual figure or not." Four times the number scaled by Keating would have been only about two-thirds of the number claimed by plaintiffs to have been scaled by Gerard. Under these circumstances we think the letter was of no substantial importance as impeaching testimony and there was no error in rejecting it.

6. Exception is taken to the reception of evidence of an estimate of the timber on the land of defendants made in 1904 by plaintiff O'Connell, together with an estimate made by another witness of the timber remaining. There was evidence of a fire in the timber in the meantime which destroyed about three million feet of logs, and also evidence that some of the timber was affected by "ring-rot," which cannot be detected while the timber is standing. The testimony objected to was not of great probative value, but the facts which detracted from its value were before the jury, and we think there was no error in its admission.

Order affirmed.