HORACE R. HAYDAY v. HAMMERMILL PAPER COMPANY.[1]

February 1, 1929.

No. 26,762.

[1]Reported in 223 N. W. 614.

*Washburn, Bailey & Mitchell,* for appellant.
*Fryberger, Fulton, Hoshour & Boyle,* for respondent.

STONE, J.

After verdict for plaintiff in this action for breach of a contract for the sale of pulpwood, defendant appeals from an order denying its motion for judgment notwithstanding the verdict or a new trial.

Plaintiff is the assignee of Hughes Brothers Timber Company, a copartnership, hereinafter designated as the sellers. Under date of October 12, 1923, they entered into a written contract with defendant, sometimes herein referred to as the buyer, for the sale of 20,000 cords of pulpwood. As to quality the contract stipulated that the wood was to be 90 per cent or more spruce and 10 per cent or less balsam "made from sound, live timber, reasonably free from knots, entirely free from worms, rot, redheart, fire killed, burned or black-wood, crotches or other harmful imperfections." The portion of the contract concerning measurement and acceptance will be quoted further on. The wood was cut during the winter of 1923-1924 and hauled or driven to Pigeon Bay or Grand Marais on the north shore of Lake Superior, to be loaded there into boats or barges for shipment to the buyer's dock at Erie, Pennsylvania. From May 21 to September 8, 1924, 33 cargoes were so shipped and delivered at Erie. There the wood was measured on board cars by representatives of both sellers and buyer. During all of the time a Mr. Salchli was the representative of the buyer. For the sellers the earlier cargoes were measured by one Carleton, and the latter by a Mr. McGovern.

On August 26, thirty cargoes had been delivered and accepted by the buyer. On that date the buyer sent to the sellers at Duluth a

telegram to the effect that the "out-turn" of the last three showed such an increase in balsam percentage of the wood shipped "that all spruce shipments from now on will not overcome. Consequently have advised Mr. Brock to allow no further balsam to be loaded." Mr. Brock was the buyer's representative at the loading points. No further deliveries were made, and unless the buyer was justified in its position as to the asserted "overrun" of balsam, it may be taken to have breached the contract. Plaintiff's case proceeds and thus far has succeeded on that theory.

Whether the provision of the contract requiring 90 per cent or more spruce or 10 per cent or less balsam was applicable to each cargo is not for decision, even though the contract provides that "in case the seller ships or attempts to deliver under this contract, wood of an inferior quality to, or different from that herein specified, the same may become the property of the buyer and all carrier charges thereon shall be borne by the seller." The case was tried upon the theory that the sellers "could not ship or deliver more balsam than would aggregate 10 per cent of the total amount called for by the contract" and were not required "to limit the balsam to that ratio or percentage or proportion on each cargo." The jury was so instructed without any suggestion then or later that the view so indicated was incorrect. It is possible that the circumstances surrounding the delivery and acceptance of the cargoes which were shipped were considered to show a practical construction which makes that view necessary.

■ The first point for the defense is that plaintiff "maintains this action under an assignment colorable, fraudulent, and without consideration, and is not the real party in interest." The brief facts in support of that proposition are that Hughes Brothers Timber Company by a written assignment of April 10, 1926, for an expressed consideration of one dollar "and other good and valuable considerations" assigned their claim against defendant to plaintiff, a resident of Pennsylvania, and appointed him their attorney in fact to "demand, sue for, and in his own name and right, collect, receive, compound and give acquittances for" the claim. As a part

of the same transaction, another written agreement was signed by Hughes Brothers Timber Company and the plaintiff binding the latter to "prosecute an action or actions for the collection of said claim or claims" and to pay to Hughes Brothers "the amount collected by him less expenses which he may incur in making such collection." Defendant is a Pennsylvania corporation, and it may be safely assumed that the assignment of the sellers' cause of action to plaintiff was for the purpose of putting the title thereto in a resident of Pennsylvania, so that defendant could not remove this action to the district court of the United States.

We consider the law already settled against this contention. By Provident S. L. A. Society v. Ford, 114 U. S. 635, 5 S. Ct. 1104, 29 L. ed. 261; Oakley v. Goodnow, 118 U. S. 43, 6 S. Ct. 944, 30 L. ed. 61; (see also Leather Mfrs. Nat. Bank v. Cooper, 120 U. S. 778, 7 S. Ct. 777, 30 L. ed. 816), it is settled that a case is not removable to the federal courts "because a colorable assignment has been made to give a state court exclusive jurisdiction." It is suggested in the Provident S. L. A. Society case [114 U. S. 635, 641] that inasmuch as by the act of congress relating to removals the federal courts may decline jurisdiction where the cause of action has been colorably assigned for the mere purpose of giving them jurisdiction, there might, "by analogy to this law, * * * perhaps, be a good defense to an action in a state court" where there is a colorable assignment to deprive the United States courts of jurisdiction. But so far we have no state statute making such an assignment a matter of defense. All we have is one (G. S. 1923, § 9165) requiring that "except when otherwise expressly provided by law, every action shall be prosecuted in the name of the real party in interest."

That plaintiff qualifies under that statute as the real party in interest seems settled law. Anderson v. Reardon, 46 Minn. 185, 48 N. W. 777; Cornish, Curtis & Greene Co. v. Marty, 76 Minn. 493, 79 N. W. 507; Jackson v. Sevatson, 79 Minn. 275, 82 N. W. 634. The accountability of plaintiff to his assignor for the proceeds of the litigation does not diminish or otherwise qualify the legal title to the cause of action vested in him by the assignment nor his result-

ing right to sue. For the purposes of the real party in interest statute, it is enough for the defendant "to know that the plaintiff is the party in legal interest, and that a recovery by him will be full protection against another suit by the assignor." Anderson v. Reardon, 46 Minn. 185, 186, 48 N. W. 777.

The argument for defendant denies the efficacy of the assignment as a transfer of legal title because alone of its obstruction of the right of removal which defendant would have had otherwise. That result is stated to be a fraud upon the rights of defendant. But the effect so complained of and that it was intended do not make fraud. The cause of action in the sellers was freely assignable by sale or gift. Defendant had no right to select the transferee nor the state of his residence. Therefore it cannot complain because the assignment was to a citizen of its own state so that when sued thereon in another state there was no right of removal. That the transfer was without consideration and its purpose to maneuver defendant out of the right of removal is of no legal consequence. So long as there was an actual transfer its motives will not be gone into. There is some analogy at this point to the rule that if the organization of a corporation is actual, the fact that it was organized in the state of its being to create diversity of citizenship in a given controversy and so confer federal jurisdiction where it would not exist otherwise is of no moment. Black & White T. & T. Co. v. Brown & Yellow T. & T. Co. 276 U. S. 518, 48 S. Ct. 404, 72 L. ed. 383. So far as they have been invited to our attention the authorities present no divergence from the views thus expressed. See 3 Foster, Fed. Pr. 2896, citing, inter alia, Vimont v. C. & N. W. Ry. Co. 69 Iowa, 296, 22 N. W. 906, 28 N. W. 612. It follows that there was no error in rejecting further evidence to explain the assignment of the sellers' claim to plaintiff. If it was all that defendant claims, it would avail nothing as a defense.

■ The action is on the contract. The verdict for $12,434.08 includes two items of damage, a balance for wood delivered and the loss claimed to have arisen from the refusal of the buyer to accept all the wood called for by the contract. There is no claim of

rescission or modification of the agreement; so its provisions as they stand are controlling. As to measurement and acceptance, they are:

"Measurement and acceptance to be made on board cars at buyer's dock at Erie * * *. Should any disagreement arise between these two representatives, a third person, mutually agreed upon by the two representatives, is to decide, and this decision is to be final and to be accepted by the buyer and seller. Should the seller not have a representative present, then the measurement and acceptance of the representative of the buyer shall be considered final."

The case for the plaintiff has proceeded apparently upon the theory that this provision of the contract was abandoned or at least that there was no attempted compliance. After being told that the contract provision for measurement "called for a determination" not only of quantity "but also of the amount of the spruce and balsam content," the jury was instructed:

"But that contract was not followed out. And so the court is instructing you that no scale that was made down at Erie is binding or controlling upon these parties. It becomes a question of fact for the jury to determine whether or not the balsam content of what had been shipped exceeded 2,000 cords, or whether, together with what balsam Hughes Brothers would have to ship in order to complete the contract, if they had to ship any more, would exceed 2,000 cords."

This instruction and other rulings on the same subject matter present the next important question. Obviously, if pursuant to the contract there was a scale at Erie, or if there was enough evidence of such a scale to make an issue for the jury whether one had been made, and if made its effect, the instruction quoted and the other rulings reflecting the same view would be prejudicial error.

The sellers were not obligated to participate in the measurement. They were not required to have a representative present. So if they had no such representative or if, being present, he refused to participate in ascertaining quantity and quality, the buyer could pro-

ceed alone. The situation with a representative of the sellers present but refusing to participate in the measurement required by the contract would be precisely the same in legal effect as though he were not present at all. And the record contains evidence that although the sellers had a representative present at Erie, he declined to do what he had a right to do under the contract. The defendant did not prevent his functioning as contemplated by the contract. On the contrary there is evidence that Mr. Salchli, the buyer's representative, requested that the representative of the sellers participate in scaling for balsam and that he refused. Mr. Salchli himself so testifies and Mr. McGovern, one of the representatives of the sellers, admits that Salchli told him "that we had to scale or estimate the amount of balsam in the wood which was coming down," and that he, McGovern, "didn't have any orders to scale it;" and although he did not so testify explicitly, the inference is plain that he never had any such orders and made no attempt to assist in ascertaining the balsam content of any of the cargoes except three. As to them he joined with Salchli in making an "estimate" showing the large "overrun" of balsam already referred to. Mr. Salchli testifies that he made his own estimate of balsam content in other cargoes and gives its result from records which he says were made at the time.

We think this state of the record made it a question for the jury whether, the seller not having elected to take advantage of its contract right to have a representative participate in the "measurement and acceptance" at Erie, there was one by the representative of the buyer complying with the contract so as to "be considered final" under its terms.

For the plaintiff much fault is found with Mr. Salchli's so-called "scale." He did not count on the cars or elsewhere the number of sticks of balsam and spruce. He made no scale based upon actual volume of spruce and balsam. The contract did not call for such a survey or scale as is customary in sales of saw logs. Compare Pratt v. Ducey, 38 Minn. 517, 38 N. W. 611. We take it that no such actual survey or scaling was necessary and that an estimate,

if one could be made in a usual and fairly dependable manner, would be sufficient. But if we are wrong in that, there is no evidence showing what is required by fact or custom to arrive at a dependable estimate or measurement of pulpwood—particularly where the purpose is to ascertain its content of different kinds of timber such as balsam and spruce.

If there was such a measurement by the buyer alone (and we find evidence that there was and that the sellers for no good reason refused to participate) it is binding until set aside. It could be avoided only for fraud or such gross mistake as would imply bad faith or a failure to exercise an honest judgment. Our cases to that effect are collected in 2 Dunnell, Minn. Dig. (2 ed.) § 1853. See also U. S. v. Gleason, 175 U. S. 588, 20 S. Ct. 228, 44 L. ed. 284. "The bona fide decisions of persons so agreed upon to determine such matters" are binding as long as they stand. Trainor v. Worman, 33 Minn. 484, 488, 24 N. W. 297. Where there is such a decision and plaintiff can recover only by getting it annulled, he must both plead and prove the grounds of annulment, for he has no cause of action otherwise. The plaintiff without pleading or proof of "fraud or partiality" on the part of the buyer's representative, "or anything to indicate a failure on his part to exercise an honest judgment in the matter, proposed to go behind his estimate and decision, and show" that he had estimated too much balsam or too little spruce. "This could not be done. The decision of a court or jury cannot thus be substituted for that of the arbiter or umpire agreed on by the parties." St. P. & N. P. Ry. Co. v. Bradbury, 42 Minn. 222, 228, 44 N. W. 1. On this phase of the case we conclude, for the reasons stated, that there was such error as to require a new trial.

Although we have so referred to it, we do not now hold that the Salchli estimate or measurement was a scale or that it complied with the contract requirement for measurement. This record does not show whether it did or did not. Estimates or averages of pulpwood made as were those in question may or may not be so dependable or so much the custom in the trade as to be sufficient. It is

noteworthy in this connection that when the sellers' representative did join in an estimate, over his own signature, of the contents of three cargoes, he did not object that such estimate was improperly made, or that Salchli's method was objectionable, or that any different one should have been resorted to. And, although we leave the question open to be finally determined on evidence which may be more comprehensive and perhaps quite different from that now before us, we see no reason in the present record why as to the three cargoes actually estimated by the representatives of both parties the result they reached should not be controlling.

■ Another point for defendant is that before the sellers had acted upon the buyer's refusal to proceed under the contract that refusal was withdrawn and that after their supposed breach it made an offer of such nature in mitigation of the sellers' damage that they were bound to accept it. We agree with the decision below that the buyer's offer was "conditioned upon the seller's acquiescence in the claim that the shipments to date, amounting to 17,000 cords, had contained 1,700 cords" of excess balsam, and that such being the case the plaintiff cannot now avail himself, in order to avoid the effect as a breach of the contract, if on the facts it is found to have that effect, of the buyer's refusal as of August 26, 1924, to accept anything but "all spruce shipments thereafter."

There is also an issue with respect to the harbor depth. The contract called for the sellers' stowing of the wood on board ships furnished by the buyer in North Shore ports having a minimum depth of 19 feet. Here again we agree with the view taken below that if the sellers breached the contract in this respect, the jury could well have found that the breach was waived by the buyer. The two questions referred to in this subdivision of the opinion will not be reopened in the event of a new trial.

Order reversed.