# HORACE R. HAYDAY v. HAMMERMILL PAPER COMPANY.[1]

July 3, 1931.

No. 28,371.

[1]Reported in 237 N. W. 600.

*Mitchell, Gillette & Carmichael* and *Donald D. Harries,* for appellant.

*Fryberger, Fulton & Boyle,* for respondent.

HOLT, J.

Defendant appeals from the judgment. There was an order denying its motion in the alternative for a reduction of the verdict or a new trial.

This is a second appeal herein. Hayday v. Hammermill Paper Co. 176 Minn. 315, 223 N. W. 614, 63 A. L. R. 210. Some questions were so disposed of by the former decision that they do not again

arise. The action is to recover damages for breach of a contract to buy 20,000 cords of pulpwood. There was a delivery and acceptance of 17,000 cords, in round numbers, when defendant refused to receive more unless the wood was all spruce. The contract was in writing and specifies as to quality:

"The wood to be ninety per cent (90%) or more Spruce and ten per cent (10%) or less Balsam."

Then come provisions as to point of delivery, loading, and stowing on vessels, followed by this provision:

"Measurement and acceptance to be made on board cars at Buyer's dock at Erie, Pennsylvania, day and date of unloading from vessel, by representative of Buyer and Seller. Should any disagreement arise between these two representatives, a third person, mutually agreed upon by the two representatives, is to decide, and this decision is to be final and to be accepted by the Buyer and Seller. Should the Seller not have a representative present, then the measurement and acceptance of the representative of the Buyer shall be considered final. In case the Seller ships or attempts to deliver under this contract, wood of an inferior quality to, or different from that herein specified, the same may become the property of the Buyer and all carrier charges thereon shall be borne by the Seller."

The buyer was to furnish the vessels for shipping the wood from sheltered harbors accessible "to boats of nineteen (19) foot draft, on the North Shore of Lake Superior." It was understood that most of the wood was to be loaded at Pigeon Bay and Grand Marais. The contract provided for advance of three dollars per cord when the wood was banked on rivers tributary to vessels' loading point upon measurement to be made by representatives of buyer and seller, the payment to be made ten days after measurement, and an additional payment of four dollars per cord after the wood was safely boomed ready for loading on vessels. The loading and stowing of the wood on vessels was to be done by seller. Thereafter all charges for transportation and unloading

were to be borne by the buyer, except as provided with regard to "wood of an inferior quality to or different from that herein specified."

Upon this trial the defendant took the position that the contract is divisible or severable—an instalment sale by cargo. But plaintiff contends that defendant is precluded from so doing because on the first trial defendant's counsel conceded the contract to be entire, and therefore a change of front cannot be made at a subsequent trial. Counsel's concession was but the expression of a legal opinion as to the construction of the contract. A party should not be concluded by an opinion hastily given by his lawyer during the trial of a case, except as it may affect the course of that trial. If a new trial is awarded there is no reason why a position contrary to that taken at the former trial may not be taken as to the law governing, provided it is the correct one and the pleadings and evidence permit. Independent School Dist. No. 35 v. Oliver I. Min. Co. 169 Minn. 15, 208 N. W. 952, 210 N. W. 856; Cadigan v. Crabtree, 192 Mass. 233, 78 N. E. 412. We think defendant may freely urge the position it now takes, that the sale was divisible into instalments by boatload.

The trial court considered the contract ambiguous as to its being entire or severable, and left to the jury the question of intent of the parties in that respect. The importance is this: If the contract was entire, then, unless there were more than 2,000 cords of balsam in the 17,000 cords delivered and the 3,000 cords boomed ready for delivery, defendant breached the contract when, on receiving the three last cargoes, it notified the seller that no more wood would be accepted except spruce. On the other hand, if severable or divisible into cargoes, the delivery of the last three of inferior quality because of the large overrun of balsam therein would in law justify a termination of the contract by the buyer.

We are of opinion that there was no error in holding the contract ambiguous in the respect stated, notwithstanding the argument that cargo or carload is mentioned four times as a unit of measure, that payment is to be made five days after measurement and accept-

ance of a cargo, and that if the seller ships inferior wood it is forfeited to the buyer, who may also collect carrier charges therefor.

But there are other provisions opposed to its divisibility. The sale was of 20,000 cords, all of which except 600 cords was to be cut, hauled, banked, driven, and boomed to fill the contract. Representatives of the buyer and of the seller were to measure the wood when banked ready for driving, and the buyer was then to pay three dollars a cord and four dollars a cord additional when all was in boom at loading points. As security for these advance payments the buyer was to receive a bill of sale of the wood. Sixty thousand dollars, or three dollars per cord for the 20,000 cords banked, was paid before March 1 and before any driving was done. There is no provision that the spruce and balsam shall be uniformly mixed or distributed. Considering that spruce grows mostly in swamps and balsam on upland, that balsam drives slower because of tendency to sink, and that it would be practically impossible to so cut, haul, pile, and drive the two sorts of wood so that in loading a vessel there would be a somewhat uniform mixture in the proportion called for by the contract, there appear valid reasons for holding ambiguity present as to the sale's being entire or severable into cargoes. If ambiguous, the intent of the parties was to be gathered not only from the writing but from the situation of the parties and surrounding circumstances—matters for the triers of fact.

In McGrath v. Cannon, 55 Minn. 457, 460, 57 N. W. 150, it is said:

"Whether a contract is entire or severable, like most questions of construction, depends on the intention of the parties, and must be determined in each case by considering the language employed and the subject matter of the contract, and how the parties themselves treated it."

The same thought is voiced thus in Bentley v. Edwards, 125 Minn. 179, 183, 146 N. W. 347, 349, 51 L.R.A.(N.S.) 254, Ann. Cas. 1915C, 882:

"This question, one of the intention of the parties, must be determined from the language of the letters, construed in the light of the surrounding circumstances."

Where ambiguity, found in a written contract, is to be solved by in part considering surrounding circumstances, depending perhaps on conflicting evidence as to facts, proper jury issues arise. Blocher v. Mayer Bros. Co. 127 Minn. 241, 149 N. W. 285; Klemik v. Henricksen Jewelry Co. 128 Minn. 490, 151 N. W. 203; O'Connell v. Ward, 130 Minn. 443, 153 N. W. 865.

In submitting whether the percentages of spruce and balsam should apply to each cargo or to the entire 20,000 cords, the court said:

"In determining the question of intent, you should take into consideration the other terms of the contract, and the evidence with reference to the way the contract was performed. The evidence with reference to the way in which the contract was performed cannot be used by you to change any words used in the contract, but only to determine the intent of the parties at the time the contract was signed, in using the language 'the wood to be ninety per cent or more spruce and ten per cent or less balsam.' "

To sustain the verdict that the sale was entire we may cite Bowe v. Minnesota Milk Co. 44 Minn. 460, 47 N. W. 151; Bentley v. Edwards, 125 Minn. 179, 146 N. W. 347, 51 L.R.A.(N.S.) 254, Ann. Cas. 1915C, 882. And among the cases cited by defendant, we think the following also lend support: Fullam v. Wright & Colton W. C. Co. 196 Mass. 474, 82 N. E. 711; Roach v. Lane, 226 Mass. 598, 116 N. E. 470; Producers Coke Co. v. Hillman, 243 Pa. 313, 90 A. 144. Many cases are cited where the sales of an entire quantity of a commodity of uniform quality such as sugar, flour, cloth, and the like, to be shipped or delivered by the carload or in instalments, have been held severable; but it seems to us they are of little aid with reference to a sale like the one here involved. To the former these words from McDonald v. Kansas City B. & N. Co. (C. C. A.) 149 F. 360, 363, 8 L.R.A.(N.S.) 1110, are applicable (after citing numerous decisions):

"The decisions in these cases hold that, where the vendor is required by an entire contract, as in the case at bar, to make successive deliveries of articles sold, and the first deliveries fail to comply with the terms of the agreement either in the quality or quantity of the goods or in the times or places of delivery, the vendee by prompt notice of his refusal to further perform upon the discovery of the failure may relieve himself from liability for subsequent deliveries."

Had the contract been severable into cargo instalments there could be no question but that the balsam overrun as certified by the representative of buyer and seller in the three last of the 33 cargoes delivered at Erie would have legally justified a termination by the buyer, even though the contract provides a profitable way for the buyer to appropriate the balsam overrun, for that is not made the exclusive remedy, and perhaps was not as advantageous as a termination in view of the large decline in the market price of pulpwood. It must also be conceded that by the acceptance of the first 30 cargoes, even if they contained an excessive quantity of balsam, the buyer did not waive a breach as to subsequent cargoes. Shotwell-Johnson Co. v. C. O. D. Tractor Co. 154 Minn. 417, 191 N. W. 813; 2 Williston, Sales (2 ed.) §§ 467d, 493.

The submission and manner of submission of the ambiguity in the contract of the expression "measurement and acceptance" is challenged by defendant. The first thought with reference to measurement is to ascertain the cord content of the wood as unloaded from the vessels and so piled on cars at the dock that the quantity could be accurately ascertained. There is nothing indicating that there should be an actual measurement for balsam content or that the spruce and balsam should be separately measured. But we think it calls for some estimate of the quality of the wood as affected by balsam content. The word "acceptance" implies that the quality was then for final inspection, and to do that balsam content was to be noted. With reference to the intention of the parties as to "measurement and acceptance," the court charged:

"Did they mean measurement by actual count of sticks, or by count of samples such as those apparent on the ends of the cars, or by count of the sticks in a blocked out portion of the carload, or something else? In determining this question of intent you should take into consideration the other terms of the contract, the evidence with reference to the way the contract was performed in that respect and any such usage, as will hereafter be defined, which you find existed at Erie, Pennsylvania, in the summer of 1924."

Then follows a caution, as above given, against letting the way of performance change the plain words of the contract. The evidence shows this as to what occurred at Erie: 33 cargoes of this wood were received and measured on board cars at Erie during the summer of 1924. The seller always had a representative there who participated in the measurement, and so did the buyer in the person of Salchli. For each cargo a certificate was issued signed by both of these representatives stating the number of cords and deducting for culls or inferior wood. These certificates do not indicate balsam content except in the last three cargoes, where it is stated to be 32, 40, and 60 per cent in each, or 504 cords in all. The seller's representative testified that he made no estimate for balsam content except in the last three, when he was asked to do so by the buyer's representative, that he never refused to participate, and did not know that Salchli attempted to make such estimates until the last three cargoes arrived. Salchli testified that the seller's representative refused to ascertain the balsam content.

Salchli entered a record of balsam content for 11 of the first 30 cargoes shipped. The manner of making such estimate was this: The wood was loaded onto gondola cars having a box three and one-half feet deep. When this box was filled the wood was piled crosswise of the car. At each end were stakes eight feet high from the floor. To ascertain the quantity they measured the height of the wood at the ends, in the middle, and midway between the middle and the ends. The average of this height with the length of the car gave the cord content. To ascertain the balsam content Salchli said he would stand on the ground facing the end of the car. He

could then see the bark of the sticks of wood piled against the stake, that is, for four and one-half feet, and determine how many of the sticks visible were balsam and how many spruce. He testified that both ends should be so viewed. If thus 16 sticks of wood composed the visible number at both ends and two of them were balsam, the conclusion was that the car contained 12½ per cent balsam. As eight cars of about 20 cords each were loaded every two hours, it is appreciated that the parties did not have a great deal of time after ascertaining the quantity or cords to accurately estimate balsam content for quality. It could not be judged by looking at the end of the sticks, for these were broomed and discolored in the drive so that the spruce could not be told from the balsam. Salchli's so-called record regarding balsam content, upon the 11 cargoes which he made alone, is disappointingly meager and fragmentary. The stick counts indicate that they could not have been from both ends in every instance, nor even in most instances from one end.

The court, as to intention of the parties in respect to "measurement and acceptance," properly permitted defendant to introduce evidence as to usage or custom in that regard at Erie. Guillon v. Earnshaw, 169 Pa. 463. The members of the seller partnership were permitted over objection to testify that they did not know of the usage claimed. They had delivered pulpwood at Erie the year before, under a contract with defendant, and some of them had been at Erie. The foundation was not very good, but under Baxter v. Sherman, 73 Minn. 434, 76 N. W. 211, 72 A. S. R. 631, the evidence was admissible. The court's charge with relation to usage entering into the contract we think was so near the language of that in Miller v. Wiggins, 227 Pa. 564, 76 A. 711, 19 Ann. Cas. 942, that no just fault can be found with it. We think it also was in substantial accord with what was approved in Stevens v. Wisconsin F. L. Co. 124 Minn. 421, 145 N. W. 173.

Error is assigned because the jury was instructed that "the way the contract was performed" might be considered in solving the ambiguities submitted. Where ambiguity exists evidence of prac-

tical construction is proper. Klemik v. Henricksen Jewelry Co. 128 Minn. 490, 151 N. W. 203; Sternbergh v. Brock, 225 Pa. 279, 74 A. 166, 24 L.R.A.(N.S.) 1078, 133 A. S. R. 877. Of course the practical construction in such cases must be limited to acts wherein both parties join; or, in other words, the construction must be harmonious and not that of one party alone. Ellis v. Stone, 21 N. M. 730, 158 P. 480, L. R. A. 1916F, 1228; Kane v. Schuylkill F. Ins. Co. 199 Pa. 205, 48 A. 989; Tustin v. Philadelphia & Reading C. & I. Co. 250 Pa. 425, 95 A. 595. The court was not requested to amplify the instruction so as to limit the practical construction to the evidence showing joint or harmonious acts of the parties. Nor do we think the matters of practical construction were in dispute—the measurements preceding the three dollar and four dollar payments per cord, the driving, booming; and loading of the cargoes and the like.

One of the main attacks upon the charge is the court's instruction as to the quantum of proof necessary to overcome Salchli's estimate of balsam content in the 11 cargoes concerning which a record was made. It is to be noted that where an estimate was so made by the representatives of both buyer and seller the court ruled it final and not open to attack. And the plain inference from the charge is that, in case the jury found that the seller's representative refused to participate in measuring or estimating the 11 cargoes that were claimed to have been estimated for balsam content by Salchli, Salchli's estimate should be considered final, for the court said:

"You are instructed that if the seller had a representative present and he refused to act, the seller would be in the same legal position on that matter as if he had no representative present."

Then with regard to Salchli's estimate the instruction was:

"I have told you that Salchli's measurement, if you find he made one in accordance with the terms of the contract, is final, unless you also find that Mr. Salchli made such a gross mistake as would imply bad faith or a failure to exercise an honest judgment."

In another place in the charge the jury was told that plaintiff had the burden of proving his case by a fair preponderance of the evidence. This included overcoming Salchli's estimate of balsam in the 11 cargoes; for if that stood, with the 504 cords of balsam overrun in the three last cargoes, over 2,000 cords of balsam had been delivered, and there was legal cause for defendant's refusal to receive the remaining 3,000 cords sold, unless all spruce.

Defendant insists that to overcome Salchli's so-called balsam scale on the 11 cargoes mentioned the proof must be clear and convincing of so gross a mathematical mistake as to imply bad faith or else fraud and collusion to which defendant was a party. Among the cases cited in support of the contention it is sufficient to refer to Nelson v. Betcher Lbr. Co. 88 Minn. 517, 93 N. W. 661, where prior cases are discussed; Malone v. Gates, 87 Mich. 332, 49 N. W. 638; Odell v. Colmor I. & L. Co. 34 N. M. 277, 280 P. 398; Lucas Coal Co. v. D. & H. Canal Co. 148 Pa. 227, 23 A. 990; Keachie v. Starkweather D: Dist. 168 Wis. 298, 170 N. W. 236; Connecticut Valley Lbr. Co. v. Stone (C. C. A.) 212 F. 713. Clear and convincing testimony has, by our decisions, been said to be required to set aside written contracts. And this applies to certificates or written awards of arbitrators. But where a litigant is not confronted with the necessity of setting aside such a document the ordinary rule of preponderance of evidence will determine the issue submitted to the jury.

Salchli and the seller's representative joined in the measurement of 33 cargoes and issued certificates signed by both of the number of cords of pulpwood therefrom delivered. These certificates are no doubt what the contract called for as final and binding. But in none of these, except the ones relating to the three last cargoes, is any mention made of balsam content. Nor was any report made to the seller by Salchli of his measurement or estimate of balsam content on the 11 cargoes of which he testified that he did make an estimate. When the tally books in which his work was entered were received in evidence the record of balsam content in the 11 cargoes referred to is so fragmentary and palpably deficient that we do not think his estimates can under any view come within the

certificates or decisions of arbitrators which are immune to attack, except for fraud and collusion or such gross mathematical mistakes as to imply bad faith. Moreover, Salchli's balsam estimates did not enter the trial of the case as an issue raised by the pleadings. In the state of the evidence, we regard the court's charge as to the effect of the estimates and plaintiff's burden to overcome them more favorable to defendant than it was entitled to.

The court's statement to the jury: "Now, unless the defendant was justified in its position as to its asserted overrun of balsam up to August 26, the defendant did breach the contract," is not considered misleading or erroneous. Defendant did take the position at the trial, and here in the brief, that, with the 504 cords of balsam in the three last cargoes, and some 1,900 cords of balsam in the 11 cargoes Salchli claimed to have "scaled" for balsam content, more than 2,000 cords of balsam had been received, and therefore it had the right to refuse the remaining 3,000 cords unless all spruce. We do not think, in thus stating the position defendant took in the trial, there was an invitation to the jury to find the contract to be entire and not severable.

Plaintiff sought to amend the complaint so as to allege a practical construction that the contract was entire and not divisible or severable. Near the end of the trial the court denied the amendment, at the same time indicating that the way the parties had performed would be submitted as bearing upon the intent wherein the contract was ambiguous. Defendant then asked for a continuance to bring certain witnesses from Erie. Nothing was disclosed as to what their testimony would be. The application was denied. We find no error in the rulings. It was not necessary to plead what was done under the contract in order to introduce evidence thereof when needed to clear up an ambiguity as to the intention of the parties.

We have endeavored to determine the decisive questions raised by the appeal and so ably presented by the exhaustive briefs of both parties. A discussion of all the authorities cited is out of the question within the reasonable limits of a decision. The case was care-

20

fully tried in the court below so as to conform as closely as possible to what this court in its former opinion indicated as the controlling issues. On the merits, had the jury found Salchli's estimates of balsam content fairly dependable and that the seller's representative refused to participate in the 11 cargoes Salchli claimed he made alone, then plaintiff should have had a verdict for only $1,584.70 and interest, as defendant requested. But evidently the jury found against defendant upon both propositions. The jury found in favor of plaintiff for $12,434.08—the same amount as found by the jury in the first trial. If defendant breached the contract without legal cause, no fault can be found with the amount of the verdict.

The record presents irreconcilable conflicts in the testimony. The long period of time intervening between the happening of the events of which the witnesses testified and their narration at the trial has dimmed memories to a great extent. No record entries are satisfactory except the certificates issued at Erie by the seller's and buyer's representatives jointly. It is almost inconceivable that the buyer would have received 11 cargoes of pulpwood with an average balsam content of 28 per cent without protest, knowing that balsam produced 20 per cent less paper material than spruce and of inferior quality. And again it is passing strange that the three cargoes could have contained 32, 40, and 60 per cent respectively of balsam—as the representative of both parties certified—if plaintiff's testimony had been true that less than 2,000 cords of balsam were in the 20,000 prepared and mostly delivered under the contract. Add to this the state surveyor's scale, showing even larger balsam content than is to be inferred from Salchli's testimony and the certificate as to the last three cargoes. The conflict was for the jury. The verdict rendered has the approval of the trial court. We find no error in the rulings or instructions which would justify the court in granting a new trial.

The judgment is affirmed.