## FLOYD v. RING CONST. CORPORATION.
### No. 1330.

District Court, D. Minnesota,
Fourth Division.

June 1, 1946.

Leonard, Street & Deinard, of Minneapolis, Minn., for plaintiff.

Brill, Maslon, Grossman & Brill, of Minneapolis, Minn., for defendant.

JOYCE, District Judge.

This suit is on an employment contract. Defendant is a construction contractor. Plaintiff was one of its superintendents and had for many years worked as an estimator and superintendent of construction for defendant. His compensation was fixed by a contract executed June 3, 1941, at a stated salary plus a percentage of the net profits on construction work that he estimated and supervised. In 1942 defendant bid on and was awarded by the United States Government two construction contracts at Camp McCoy, Sparta, Wisconsin, on what was known as Areas C and E. There is a dispute as to whether plaintiff did any substantial amount of the estimating on these projects but in any event the parties entered into a supplemental agreement providing that plaintiff was to super-

vise only Area C and was to receive ten per cent of the net profits on that Area alone with a minimum of $3,500 per month from April 1, 1942, to the date of the completion of the construction. This supplemental agreement is dated April 1, 1942, but was actually signed later in the year when construction was almost completed. However, the 1941 contract, except as modified, remained in full force and effect and it is the language of that contract that is the basis of this litigation. The contract is in the form of a letter written by plaintiff to defendant confirming their agreement and is signed by both parties. The pertinent part reads:

"I am to receive ten percent of the net profits of each and every job estimated by me which is awarded to you, and the monies arising from the profits will not become due to me until the work undertaken has been completed and accepted and full settlement is received by Ring Construction Corporation from the owner, and in connection with such jobs I am to act as Superintendent. Net profits as used herein is understood and agreed to be the difference between the contractors price and the total cost of labor, materials, subcontracts, insurance and social security taxes and all special taxes that may be imposed by the State, in other words, all licenses, permits and taxes to be paid from this project except the United States Federal Income Tax only; freight and cartage, telephone and telegrams, hotel rooms or office at the job. Itemized transportation expenses which is definitely incurred in securing the award of any such contracts or which are necessarily incurred in connection with the supervision of the job after award. Any equipment placed on the job is to be charged as expense at the prevailing rental rate in the locality of the job or job depreciation depending on which is the lesser. All expenditures made by the Minneapolis office such as freight, stamps and telephones directly in connection with the job that I am supervising will be charged against the job cost. This job will reimburse Ring Construction Corporation offices and expenditures as outlined above. If the Ring Construction Corporation has other work that I have not esti-mated or for which I have not made prior agreements or executed same in writing, I will have no claim or any interest in such work that Ring Construction may have under construction."

The meaning of the terms "full settlement", "contractor's price" and "net profits", as used in the contract as quoted, in view of subsequent developments is the kernel of this dispute. The construction work on these projects commenced in April, 1942. On April 28, 1942, the Renegotiation Act, 50 U.S.C.A.Appendix, § 1191, became effective which by its terms subjects defendants contract with the government to renegotiation. The project was substantially completed by November, 1942, and was accepted by the government. The full contract price was paid and defendant realized a profit of some $4,000,000. Using this figure as a basis, plaintiff computes his percentage on Area C at $120,000 and is suing for this amount less the $24,500 he has already received on the fixed monthly compensation arrangement previously mentioned. Since the completion of the project defendant and the government have been engaged in numerous renegotiation proceedings without reaching a settlement. Defendant's case is now pending in the Tax Court where defendant is attacking both the constitutionality of the renegotiation act and the amount of the demand under the act as determined by the Assistant Secretary of War (the demand which defendant has refused to pay is $1,365,000). It is defendant's position that there has yet been no "full settlement" and that "net profits" have not been and cannot be determined until the renegotiation proceedings are finally ended, and that the action should be dismissed for being prematurely brought. Plaintiff's position is that the Renegotiation Act has no effect on his contract, that as the contract price has been paid defendant has had a full settlement and that plaintiff's percentage is now due computed on the "net profits" before or in disregard of renegotiation.

The issue is prdincipally one of law. Counsel have expended considerable energy in an analysis of the renegotiation law, its underlying philosophy, its legislative history and probable constitutionality in

whole or in part. I do not believe that many of these questions are pertinent here. The only issue in this case is the meaning of the contract between plaintiff and defendant. Plaintiff insists that the contract is not ambiguous and therefore the evidence bearing on the construction the parties placed on it is irrelevant. This argument is particularly urged in relation to the definition of "net profits" contained in the contract. This definition is: "Net profits as used herein is understood and agreed to be the difference between the contractors price and the total cost of labor, materials, subcontracts, insurance and social security taxes and all special taxes that may be imposed by the State, *in other words, all licenses, permits and taxes to be paid from this project except the United States Federal Income Tax only.*" (Italicizing supplied.)

If the Renegotiation Act is considered as a tax of any kind it must be included in the deductions as it is obviously not the United States Federal Income Tax referred to as the renegotiation law was not enacted at the time this contract was entered into. The word "only" is significant in this connection as it was apparently the intention of the parties to put only the Federal Income Tax in a separate category. If this part of the contract is not ambiguous it would seem that plaintiff's contention must fall as the "United States Federal Income Tax" is the only tax excluded from the computation of net profits.

■ Plaintiff meets this contingency by arguing that the Renegotiation Act as applied to defendant's contract is not a tax but only "recaptures" the excess profits already realized. Plaintiff asserts this is done without affecting the "contractor's price" within the meaning of the contract in suit. This reasoning, if pursued, would result in the conclusion that the Renegotiation Act by "recapturing" the excess profits made by the contractor on his government contract would not affect the contract price. Such an argument might be relevant where the constitutionality of the Renegotiation Act is under attack as being violative of the prohibition against impairing the obligation of contracts. But in this case we are not concerned with an abstract legal construction of the Renegotiation Law. We are concerned only with its effect on this contract between this plaintiff and this defendant. What their intention was is controlling.

■ It is obvious that when the principal contract between plaintiff and the contractor was executed in 1941 the parties could have no intention of any kind concerning the Renegotiation Act because as stated it was not enacted until April 28, 1942. It is that fact that causes the contract to be uncertain and ambiguous when an attempt is made to construe it in the light of the subsequent legislation. In such a case it is proper to resort to extrinsic evidence as an aid to construction. Wilmot v. Minneapolis Auto. Trade Ass'n, 169 Minn. 140, 210 N.W. 861, where the Minnesota Supreme Court said: "The duty of courts is to apply contracts to their subject-matter and so effect the purpose of the parties. Their interpretation is incidental. To accomplish the main object, resort may and frequently must be had to the circumstances under which the contract was made, and, if there be need for resort to extraneous aids to construction, it is immaterial whether such need arises from an uncertainty in the instrument itself, or that being clear standing alone, it ceases to be so and ambiguity arises when the contract is applied to its subject-matter. In either case construction must follow, and resort must be had to the aids furnished by extrinsic circumstances. The prohibition of the law is not against their being used for interpretation, but against making them the instruments of contradiction of an expressed contractual intent." (169 Minn. at page 142, 210 N.W. at page 861.)

■ The rule is stated in 17 C.J.S., Contracts, § 325, page 755: "A reasonable construction of an ambiguous contract by the parties thereto, although not conclusive, will be considered and accorded great weight, and usually will be adopted, by the court."

This is clearly the rule in Minnesota as illustrated by City of South St. Paul v. Northern States Power Co., 189 Minn. 26,

248 N.W. 288, 291, where the court said: "Where ambiguity exists in the terms of a contract, it is well settled that the construction the parties in their dealings and by their conduct have placed upon those terms furnish the court with very persuasive evidence of the true meaning of the same. In other words, courts accept the practical construction the parties to an ambiguous contract have given it." See also Hayday v. Hammermill Paper Co., 184 Minn. 8, 237 N.W. 600; Mueller v. Chicago & North Western Ry. Co., 194 Minn. 83, 259 N.W. 798.

The parties here actually signed their supplemental agreement, incorporating the 1941 contract therein by reference, after the Renegotiation Act had become law. Both parties were well aware of this legislation and were interested in the effect it would have on defendant's operations. The evidence convinces me that they both understood plaintiff's percentage of profits could not be computed until it was determined what amount of profit defendant would have left after renegotiation and both parties acted accordingly. There was voluminous correspondence over a period of more than a year between plaintiff and defendant or its attorneys from which the only inference to be drawn is that plaintiff clearly understood that his compensation was dependent on renegotiation. Plaintiff even gave his advice as to how best to proceed before the renegotiation board and attended a hearing in Washington before that panel. Before defendant made an offer to return a million dollars of his profits he obtained plaintiff's written consent thereto. Plaintiff's testimony that he did not know what he was doing when he signed this instrument is simply incredible. No purpose would be served by further reviewing the evidence except to say that at no time from the passage of the Renegotiation Act in April, 1942, until his complaint was served in February, 1945, did plaintiff ever take the position that he asserts here.

It is my conclusion that the words "full settlement" as used in the contract contemplate termination of the renegotiation proceedings as a condition precedent. The action is therefore premature.

Throughout this memorandum I have assumed the validity of the Renegotiation Act. I do not mean to express any opinion on the validity or constitutionality of that act either in general or as applied to defendant's contract with the government. That question is not here. Defendant has presented that question in its suit now pending in the Tax Court. If it is ultimately decided that defendant's contract is subject to renegotiation and such renegotiation is accomplished, then it will be possible to determine defendant's liability to plaintiff on their contract. If it is finally decided that the Renegotiation Act is invalid or is not applicable to defendant's contract with the government, then all the issues in this case become moot.

The suit is dismissed without prejudice. Findings of fact and conclusions of law will be filed in harmony with this memorandum.