HENRY F. SCHEPMAN, RESPONDENT, v. MUTUAL BENEFIT HEALTH AND ACCIDENT ASSOCIATION, APPELLANT.—104 S. W. (2d) 777.

Kansas City Court of Appeals. April 5, 1937.

652

*Sherman & Sherman* for respondent.

*Brown, Douglas & Brown* for appellant.

BLAND, J.—This is a suit on an accident insurance policy. There was a verdict and judgment in favor of the plaintiff in the sum of $5266.66, and defendant has appealed.

The facts show that one Orland O. Turner, a druggist of St. Joseph, Missouri, the holder of an accident insurance policy with the defendant, met his death on November 30, 1934, as a result of a hemorrhage of the brain. The wife of the insured, Mrs. Laura L. Turner, was the beneficiary in the policy. Defendant denied liability for the death. Mrs. Turner assigned to the plaintiff her cause of action upon the policy and this suit was brought by him.

It is claimed by the plaintiff that insured suffered an accidental injury by striking his head against the headboard of his bed on October 21, 1934, resulting in his having a stroke of apoplexy the next morning and, finally, a second stroke thirty-nine days after the accident, resulting in his death. The second stroke, it is claimed, was induced by "delayed apoplexy" caused by the blow on the head of the insured.

Mrs. Turner, the wife of the insured, was the only witness to the accident. She testified that on the evening of October 21, 1934, insured was sitting in his nightclothes in an upright position in his bed reading with the aid of a light from a fixture hanging from the ceiling about on a line with the foot of the bed; that there was a bed light over the headboard; that insured decided to use the bed light and, in order for him to do so, it was necessary for him to assume a reclining position; that in changing positions he struck the back of his head against the front side of the headboard. The thickness of the headboard was somewhat heavier than that of a pencil.

Mrs. Turner further testified that insured "threw himself back—

he didn't deliberately lie down. Mr. Turner was a man of very rapid movements. He never sat down or got up or made any movement in a slow, deliberate way. He did this in the same way. He just flopped back and as he hit it, he struck his head right here (indicating) to the side of a little bit and with such force that I said, "Honey, what are you trying to do, knock the bed down? And he said he had forgotten, that he had scooted back in bed." The witness further testified that insured did not shove himself back, "he just flopped back, just an abrupt flop;" that he did not strike the edge of the bed but the front or flat side; that the witness asked insured whether he was hurt and he replied, "'Yes, it hurts,'" "and he said that in a rather emphatic manner." The witness asked him if he wanted her to rub anything on his head and he said, "No, I think it will be all right."

The evidence further shows that, as a result of the blow, there appeared a red place somewhat puffed up on the back of insured's head. When the swelling subsided, three or four days afterwards, an area of tenderness was found by the doctor about two inches in diameter at the base of the skull of insured, starting about an inch to the left of the right ear and extending over toward the left. This area was about half an inch above the bottom of the ear. The tenderness continued until the time of the death of insured.

Mrs. Turner further testified that insured resumed his reading from the bed light; that she went to another part of the house and stayed about an hour; that she returned about ten o'clock and found insured asleep; that he slept until six o'clock the next morning; that beginning about three o'clock she became restless; that she tried not to waken insured and did not do so but finally her restlessness caused him to waken; that he was asleep from eight and one-half to nine hours; that there was nothing to indicate to her that insured was suffering any pain during the night; that so far as she knew he did not waken prior to three o'clock and that to her knowledge did not waken after that time until six o'clock; that he was able to sleep, and showed no evidence of pain, approximately nine hours so far as she knew; that "he could have been suffering pain and I never knew it;" that when insured awoke he asked Mrs. Turner, "What is the matter, are you ill?;" that he did not say anything about the injury to his head; that the conversation covered a few seconds; that he then started to get up with the purpose of going to the bathroom but had barely placed his feet on the floor when he fell back across the bed in a faint, where he remained unconscious for fifteen or twenty minutes; that after he regained consciousness and the doctor was called he suffered intense pain in the back of his head; that this pain could not be relieved with medicine; that he continued to suffer from this pain until the time of his death; that in the interim he obtained no relief from these pains until the end of three

weeks when they were not so bad; that he was confined to his bed about four weeks when he began to sit up a little in bed; that he then sat up in a chair for a while and finally was able to walk about the house. He lived above his store and went down the stairs a day or two before Thanksgiving, not into the store, but merely to get into the sunshine a little on the front steps. On Thanksgiving Day he relieved a man in the store for about an hour, but did not wait on anyone, after which he went upstairs and to bed. At no time was he out of bed for the entire day. On the night of his death he had been listening to the radio and started from the bathroom to his bed, when he had another stroke, rendering his unconscious, in which state he remained until the time of his death, a few hours afterwards.

The evidence shows that in 1923 insured was treated for pernicious anaemia, which the medical testimony shows is incurable. However, the evidence on the part of the plaintiff tends to show that for several years prior to his death insured was apparently in good health. He had never suffered from any unusual headaches or pain in the back of the head. An examination made of him after his first stroke showed that he did not have high blood pressure and that his heart and lungs were normal. After the first stroke, aside from the severe headaches, the sore spot where his head struck the bed and his weakened physical condition, there was nothing unusual in respect to insured's mental and physical condition.

The theory of delayed apoplexy advanced by the physicians for the plaintiff, as applied to the facts in this case, is that the blow received when insured's head struck the headboard of the bed, produced a hemorrhage in the small blood vessels or capillaries of the brain which produced an area of softening; that this condition, in the course of time, tended to weaken the larger vessels thereby predisposing them to rupture; that one or more of them finally did rupture at the time of his death.

Plaintiff's physicians, however, testified that death by cerebral hemorrhage, unaccompanied by trauma, is common in men of about the age of 56, which was that of insured, and that the initial stroke on October 21st, followed by a second and fatal stroke on November 30th, was typical of the ordinary processes of arterial degeneration; that in the normal course of arterial degeneration a minor stroke might be anticipated before a serious, fatal one; that if it were not for the history of the case they would arrive at the conclusion that insured's death was due to arterial degeneration. However, arterial degeneration is usually caused by hardening of the arteries but can be caused by any disease associated with the blood vessels. There is no evidence, in this case, that deceased suffered from hardening of the arteries. One of insured's physicians testified that pernicious anameia was not a disease of the blood vessels but a disease of the blood, itself, and would not have any influence in causing arterial degeneration.

There was much testimony to the contrary. However, the two physicians testifying for plaintiff, stated, in answer to hypothetical questions submitting the history of the case, that the death of insured was caused by delayed apoplexy caused by the blow he received on the head. Being questioned relative to whether the theory of delayed apoplexy could explain the first stroke, they said that it could not inasmuch as it would require several days for a condition to develope sufficient to cause a rupture of the larger blood vessels. However, there was sufficient in their testimony to support a conclusion on the part of the jury that there was a connection between the blow on the head and the first stroke.

One of plaintiff's physicians stated that an autopsy should have been performed. The evidence shows that defendant did not request one until two and one-half months after the burial of the insured. He had been buried in a hermitically sealed vault. Mrs. Turner refused the request as the vault would be destroyed in the exhumation.

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given for the reason that there is no substantial evidence to support the finding that the blow to insured's head caused his death. In this connection defendant says:

"Is the burden of proof satisfied by the inference that a blow to the head—not sufficient to break the skin, to produce a bruise or contusion no longer visible three or four days thereafter, to necessitate treatment or to prevent the recipient from continuing with his evening reading—could produce a stroke thirty-nine days thereafter, when there was on the following morning a stroke in no way connected with this blow, a stroke sufficiently serious to produce unconsciousness for a period of fifteen or twenty minutes? Which is the more likely activating force, considered especially in the light of the doctors' testimony that the history of a non-fatal stroke occurring on October 22, followed by a second fatal stroke on November 30, would give a typical picture of the ordinary course of arteriosclerosis or arterial degeneration, unaccompanied by, or unaffected by trauma?"

Let us further examine the record in the light of this contention of the defendant.

The evidence shows that there are two kinds of hemorrhages of the brain, one a minor one, when the small blood vessels of the brain, which may be those merely on the surface, are ruptured. This does not cause death, but may cause a stroke. The other is what is referred to as a massive or a large hemorrhage. This occurs when a larger blood vessel is ruptured. A stroke in either case is caused not primarily by the rupture of the blood vessels but as a result of pressure by the escaped blood, or a blood clot caused by the rupture, on the nerve centers of the brain. A stroke of

apoplexy may also be caused by shock to the brain resulting from a blow.

Dr. Byrne, a witness for the plaintiff, testified that he recognized Tice in his book "The Practice of Medicine," as an authority on apoplexy and agreed with Tice that an attack of apoplexy "is *usually* preceded by some precussion symptoms, such as a sensation of fulness in the head, headache, nausea, vomiting and ringing in the ears." (Italics ours.) It will be noted that, in the case at bar, there is no evidence that insured suffered any of these symptoms prior to his first stroke. However, Dr. Byrne further testified:

"Q. In order to get a stroke, producing unconsciousness, for twenty minutes, you have to have a considerable amount of pressure, do you not? A. That is something else, too. I don't know exactly why people become unconscious following an injury to the head. It has been demonstrated that even massive hemorrhages have not produced unconsciousness. Unconsciousness is a condition following injury that so far is not well understood. A condition of unconsciousness might occur from a small hemorrhage or a contusion in one individual and in another there would be no appreciable effects at all.

"Q. I am not speaking of unconsciousness immediately, nor accident where concussion might have effect but unconsciousness following 10 hours after an accident. It would take considerable pressure? A. The same rule would prevail—you might have your unconsciousness following a small hemorrhage or it might follow a large hemorrhage.

"Q. But it is the amount of pressure that determines it? A. I don't know whether it is the pressure or whether it is the effect on the brain cells themselves. The shock might do it, the shock following a hemorrhage, even a small hemorrhage might produce unconsciousness.

"Q. You should have some symptoms when the hemorrhage is produced, should you not? A. You might not have any symptoms that the patient would be aware of. He may feel a little dizzy but not enough that he would appreciate it himself."

It will be remembered that, between the time insured struck his head and the time he had his first stroke, he was in bed. One lying down is less likely to experience a sensation of dizziness than one on his feet. One of defendant's physicians testified that the authorities do not make the point that the blow be severe or light in order to produce apoplexy and another that a degenerated blood vessel will rupture easier than one not degenerated.

Defendant makes much of the following passage from Tice upon the subject of delayed apoplexy, which appears in the evidence:

"Under this name is understood an attack of apoplexy with loss of consciousness, occurring sometime (but not immediately) after

trauma which was first described by Dollinger in 1811. Cases have been reported in which the interval between the traumatism and the stroke lasted from six days to four weeks. Autopsy showed in the majority of cases a cerebral hemorrhage. Trousseau has shown that a rupture of a blood vessel may occur some time after concussion by means of thrombosis of capillaries, a focus of softening is thus formed in the center of which a secondary hemorrhage takes place. In the cases of delayed apoplexy the blood vessels were found diseased (arterio-sclerosis). Trauma, therefore, plays only an exciting role in an individual with an already altered vascular system.''

In reference to this passage Dr. Byrne testified:

''Q. If that is true, the only cases of delayed apoplexy are where there are already diseased conditions to begin with? A. I don't know that that is true. I can conceive of a hemorrhage occurring, as the result of a bruise to brain tissue, and the hemorrhage occurring in a vessel that had been normal.''

Of course, even if the blood vessels of insured were diseased, this would not prevent recovery under the policy. The law in reference to such a situation is well stated by the defendant as follows: ''The courts have long since established the rule that the fact that a pre-existing physical infirmity may be a necessary condition to the ultimate result, does not deprive an activating, accidental injury of its distinction as an independent, exclusive cause.'' However, there is no evidence in this case which shows that deceased suffered from arterio-sclerosis and there is evidence from which the jury could find that deceased did not suffer from any kind of arterial degeneration. It was the opinion of plaintiff's physicians that a man might die from delayed apoplexy, although his blood vessels, prior to a traumatism, were in normal condition.

However, our attention is called to that portion of the passage in question from Tice which states that ''Cases have been reported in which the interval between the traumatism and the stroke lasted from six days to four weeks,'' also to the fact that, in the case at bar, the second stroke did not occur until five and a half weeks after the injury. It will be noted that Tice does not say that it would be impossible for the stroke to occur as long after the blow as in this instance but that the cases that had been reported were those where the interval was from six days to four weeks. Dr. Byrne testified that ''It has been stated by authorities that usually in a period of *about 6 weeks* the rupture is apt to occur, following an injury.'' (Italics ours.) As before stated, both Doctors Byrne and Branson testified that insured died as a result of delayed apoplexy caused by the injury he received.

Defendant makes much of another passage from Tice on ''The Practise of Medicine,'' reading as follows: ''*Primary* hemorrhage is often associated with the entry of fragments of bone, the result

658

of fracture of the skull with the passage of a projectile, etc. Such a hemorrhage is massive in character and usually superficial in position. A large hemorrhage into the basil ganglia is rarely the result of trauma." (Italics ours.) Also the passage stating that "When a person who has fallen and injured his head is found to have a massive hemorrhage in the basal ganglia, it is most probable he has first had the hemorrhage and that the injury to the skull is a consequence and not a cause." It is admitted in this case that insured died from a large hemorrhage into the basal ganglia. It will be noted, however, that in the passage last quoted from Tice the question of primary hemorrhage, or massive hemorrhage resulting from trauma, is discussed rather than delayed apoplexy. That part of the passage stating that "When a person who has fallen and injured his head is found to have a massive hemorrhage in the basal ganglia it is most probable he has first had the hemorrhage and that the injury to the skull is a consequence and not a cause," we think, has no bearing upon the case at bar because first, it has no reference to delayed apoplexy and, second, the statement evidently has reference to cases where the patient is first seen after the fall and its cause is unknown. Here, the facts show that plaintiff struck his head before he had the first stroke and the circumstances under which he received the injury are known. According to the testimony of Mrs. Turner, insured did not strike his head as a result of fainting or falling but because he "scooted back in bed." It will thus be seen that the evidence, taken in its most favorable light to plaintiff, is contrary to the theory advanced by defendant.

However, defendant says that insured did not exhibit the symptoms that are attendant upon delayed apoplexy; that such apoplexy is brought about by a blow upon the head causing a rupture to the small blood vessels of the brain, resulting in a gradually increasing accumulation of blood, which defendant says would cause increasing pressure upon the brain resulting in the patient growing worse instead of better; that the evidence in this case shows that insured's condition improved after the expiration of three weeks from the receipt of the blow; that the usual symptoms surrounding delayed apoplexy are different from those where a primary nontraumatic hemorrhage takes place; that, in the latter instance, the hemorrhage is the result of arterial degeneration and the first stroke, or the initial minor hemorrhage, produces merely temporary pressure, with accompanying symptoms; that this gradually disappears as the blood clot is absorbed and the pressure is reduced but is followed by the further breaking down of an artery in a more vital spot.

We are not prepared to say that the evidence, taken in its most favorable light to the plaintiff, shows such distinguishing characteristics between the two kinds of hemorrhages. Dr. Branson testified:

"Q. And the rupture occurring 10 hours after the history of

the blow could not have been caused by any softening process? A. No, the only way I could figure this attack after the blow would be that you had a small hemorrhage at the time and your area of seeped blood. In other words, you did not have a severe enough hemorrhage to produce death at the time but you had your clot there which continued to stay there and gradually absorbed and became soft.''

However this may be, we think the defendant over-estimates the degree of improvement that insured underwent, beginning three weeks after the injury. The evidence shows that while the pains in his head became less severe they, at no time, subsided and that the area where he received the blow was tender until the time of his death. The evidence further shows that, while he was confined to his bed for the first three weeks and was able to be up and about some after that time, he was never able to return to his ordinary duties as a druggist; that he was out of the house but little and there was no day in which he was not required to be in bed a part of the time. This is not a picture of a man who had regained much of his health. It may be as Dr. Byrne says, that a blood clot first formed but that it gradually was absorbed and, probably, in the course of its absorption, insured's condition was apparently improved but that in the course of such absorption the larger blood vessels became soft and finally gave way.

We think there is ample evidence for the jury's consideration tending to show that insured's death was the result of the accident. Here we have a man who, for several years, apparently had been in good health, with his heart and kidneys in normal condition and with no high blood pressure. He receives what must have been a rather severe blow to his head, followed, in a few hours, by a stroke of apoplexy, then by intense pains in the region where he received the blow. Physical weakness, head pains and tenderness in the area of the receipt of the blow continued until the time of the final stroke and death. On the question of the severity of the concussion it might be stated that one of defendant's physicians testified that while he was of the opinion that it did not cause the second hemorrhage resulting in insured's death, it could have caused severe headaches such as insured suffered. Under all of the circumstances, including such medical testimony as was favorable to the plaintiff, the jury were at liberty to find that the blow resulted in the death of insured. [McDonald v. Met. St. Ry. Co., 219 Mo. 468; Sharp v. Ry. Co., 213 Mo. 517.]

Defendant makes much of some apparent inconsistencies between the notice and the proofs submitted by the wife of insured, Mrs. Turner, and the theory of the accident and the consequent death advanced by the plaintiff at the trial. However, the jury was at liberty to take all of the evidence in its most favorable light to the

plaintiff and to disregard any inconsistencies existing between the notice and the proofs and the evidence at the trial. [Frankel v. Hudson, 271 Mo. 495.]

We have examined the cases cited by the defendant and find them not in point, as being wholly dissimilar as to the facts.

Defendant complains of the giving of plaintiff's instruction No. 1, which covers the entire case and directs a verdict. It is claimed that this instruction is erroneous because it did require the jury to find that insured's death resulted "directly and independently of all other causes from bodily injuries sustained through accidental means," as provided by the policy.

The instruction submits the terms of the policy providing that deceased was insured "against loss of life resulting directly and independently of all other causes, from bodily injuries sustained through purely accidental means," and then tells the jury that it must find that insured "through purely accidental means, *as provided for in the insuring clause* of the policy, fell backward in his bed, striking his head against the headboard" and that a "cerebral hemorrhage which brought about his death was the direct result of the fall and injuries hereinbefore set forth," etc.

It is difficult to see how the jury could be misled under the facts in this case, even though the provisions of the policy had not been submitted to the jury prior to a submission of the particular facts resulting in insured's death. However, the worst that can be said of the instruction is that it is somewhat obscure in its language in reference to the point in controversy. Any such obscurity was made clear by the giving of defendant's instruction B (Sutter v. Met. St. Ry. Co., 208 S. W. 851), which reads as follows:

"The court instructs the jury that if you believe and find from the evidence that the loss of life of Orland O. Turner did not result directly and independently of all other causes, from bodily injuries sustained through purely accidental means, or if you find and believe from the evidence that the said Orland O. Turner did not sustain bodily injuries which independently and exclusively of disease and all other causes, immediately, continuously, and wholly disabled the said Orland O. Turner from the date of the accident to and result in his death, if you so find, then in either of said events, your verdict will be for the defendant."

A suit was brought on the policy by the wife of the insured, as beneficiary. Thereafter, upon the application of the defendant, the cause was removed to the Federal Court, whereupon, the case was dismissed by the plaintiff. Thereafter, Mrs. Turner assigned this cause of action to the plaintiff for the purpose of collecting her claim against the defendant, resulting in the present suit. The assignment, no doubt, was brought about in order to escape the removal of the suit to the Federal Court, for the reason that both the present

plaintiff and the defendant are citizens of the State of Nebraska, while Mrs. Turner is a citizen of the State of Missouri.

The assignment provides that the plaintiff shall prosecute the action against the defendant and, after deducting all costs and expenses, to hold the proceeds collected in trust for the use and benefit of Mrs. Turner. It recites: "It is the intention of the parties hereto that said Henry Schepman shall have the full and complete legal and equitable title to the above claim or claims and chose or choses in action and that he shall be a trustee of the express trust herein set out in accordance with the laws of the State of Missouri."

Defendant, in its answer, pleaded that this assignment was void as being fraudulent and without consideration. It is the contention of the defendant that its instruction in the nature of a demurrer to the evidence should have been sustained for the reason that the assignment was fraudulent as being for the purpose of preventing the removal of the case to the Federal Court; that it is the duty of the State courts to protect defendant's right of removal, by declaring the assignment fraudulent and void.

We know no better way to answer this contention of the defendant than to quote from the Supreme Court of Minnesota, as follows:

"We consider the law already settled against this contention. By Provident Savings Life Assurance Society v. Ford, 114 U. S. 635, 5 S. Ct. 1104, 29 L. Ed. 261; Oakley v. Goodnow, 118 U. S. 43, 6 S. Ct. 944, 30 L. Ed. 61 (see, also Leather Manufacturers' Nat. Bank v. Cooper, 120 U. S. 778, 7 S. Ct. 777, 30 L. Ed. 816), it is settled that a case is not removable to the federal courts 'because a colorable assignment has been made to give a state court exclusive jurisdiction.' It is suggested in the Provident Savings Life Assurance Society's case that inasmuch as by the act of Congress relating to removals the federal courts may decline jurisdiction where the cause of action has been colorably assigned for the mere purpose of giving them jurisdiction, there might, 'by analogy of his law, . . . perhaps, be a good defense to an action in a state court' where there is a colorable assignment to deprive the United States courts of Jurisdiction. But so far we have no state statute making such an assignment a matter of defense. All we have is one (G. S. 1923, par. 9165), requiring that 'except when otherwise expressly provided by law, every action shall be prosecuted in the name of the real party in interest.

"That plaintiff qualifies under that statute as the real party in interest seems settled law." [Hayday v. Hammermill Paper Co., 223 N. W. 614, 615, 616.]

We have a statute in this State requiring, with certain exceptions, that the real party in interest shall bring suit, also, one providing that a trustee of an express trust may bring it and, also, one recognizing the right of assignments of causes of action (see sections

698, 699, Revised Statute 1929). The right of a claimant to assign his cause of action for collection is well established. [Haysler v. Dawson, 28 Mo. App. 531.] We have no statute making an assignment a matter of defense in a situation of this kind. An examination of the cases of Reynolds v. Grain Belt Mills Co., 59 S. W. (2d) 744, and Reynolds v. Grain Belt Mills Co., 334 Mo. 712, will disclose that our Supreme Court recognizes the right of a litigant to select the forum by indirect means. However, defendant says that the assignment is void, in that its terms are self-destructive, because: "It speaks of an assignment, of a transfer, of an express trust for the benefit of Mrs. Turner, and at the same time of the vesting of the complete legal and *equitable* title in plaintiff." (Italics ours.)

We do not find that this contention was made in the trial court. However, even if the assignment can be said to be somewhat ambiguous it certainly conveys a legal title to the cause of action. Plaintiff is not a party to the assignment and there are methods of determining its meaning if an occasion arises where there is a dispute between the parties as to that matter. [See 13 C. J., pp. 535, 536.] However, defendant says that if it "is not entitled to defend this case against the party who is, in effect, directing this course, and is alone interested in the outcome, then at least it should be entitled to know what is the legal interest and right of the figure-head in whose name the action is brought."

There is no merit in this contention. The only interest the defendant has in the matter of the assignment is whether it will be fully protected if it pays the debt to the assignee. No one else is claiming the money. All of the parties to the assignment agree that it should be paid to the plaintiff, as assignee, and the defendant will be fully protected in paying the claim or judgment to him. [Cornish, Curtis & Green Co. v. Marty, 76 Minn. 493.] The judgment is affirmed. All concur.