## FLOYD v. RING CONST. CORPORATION.
### No. 13585.

Circuit Court of Appeals, Eighth Circuit.

Jan. 8, 1948.

Rehearing Denied Feb. 9, 1948.

Benedict Deinard, of Minneapolis, Minn. (Arthur L. H. Street and Leonard, Street & Deinard, all of Minneapolis, Minn, on the brief), for appellant.

Josiah E. Brill, of Minneapolis, Minn. (Brill, Maslon, Grossman & Brill, of Minneapolis, Minn., on the brief), for appellee.

Before GARDNER, THOMAS and JOHNSEN, Circuit Judges.

THOMAS, Circuit Judge.

The parties to this proceeding agree that the ultimate question presented by this appeal is whether the trial court erred in denying the plaintiff-appellant's demand for a jury trial. The purpose of the action is to recover upon a written contract compensation for expert services. The complaint was filed February 2, 1945, the answer on February 16, 1945, and the demand for a trial by jury pursuant to Rule 38(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, on February 19, 1945. Thereupon the action was designated upon the docket as a jury action. At a pretrial conference in March, 1945, the court concluded that a right of trial by jury did not exist and on March 16, 1945, the case was ordered transferred from the jury calendar to the court actions calendar with exception to the plaintiff. After trial to the court the complaint was dismissed without prejudice on the ground that the case was prematurely brought. D.C., 66 F.Supp. 436.

The question of plaintiff's right to a jury trial was raised in a motion for a new trial. In overruling that motion the court in a memorandum held that (1) the cause of action, as disclosed by the complaint, involved an accounting, is accordingly cognizable in equity, and does not, therefore, call for a jury trial; and (2) assuming, arguendo, that it was error to deny a jury trial, then it was harmless error for the reason that had there been a jury trial the court would have been bound to instruct the jury to bring in a verdict for the defendant at the close of all the evidence or to have set aside any verdict which the jury might have brought in for the plaintiff.

Two questions, it is obvious, underlie the determination of whether the court erred in denying plaintiff a jury trial. They are: (1) Whether the nature of the action, as shown by the complaint, is such as to entitle plaintiff to a jury trial; and (2) If so, whether denial of his demand for a jury trial was harmless error.

If the first of these underlying questions be answered in the negative or the second in the affirmative the judgment appealed from must be affirmed. In order to answer these questions it is necessary to review briefly both the pleadings and the evidence.

The complaint alleges that the plaintiff is a resident of Virginia and that the defendant is a Maryland corporation with its principal place of business in Minneapolis, Minnesota, engaged in the construction business. From June 3, 1941, to March 24, 1942, plaintiff was employed by defendant as estimator and superintendent of construction on a job in Pittsburgh, Pennsylvania. The terms of his employment at that time were embodied in a written contract in the form of a letter from plaintiff to defendant dated June 3, 1941, pursuant to the terms of which he was paid a fixed monthly salary of $400 and a percentage of the net profits on work which he estimated and supervised. The pertinent part of the contract reads: "I am to receive ten percent of the net profits of each and every job estimated by me which is awarded to you, and the monies arising from the profits will not become due to me until the work undertaken has been completed and accepted and full settlement is received by Ring Construction Corporation from the owner, and in connection with such jobs I am to act as Superintendent. Net profits as used herein is understood and agreed to be the difference between the contractors price and the total cost of labor, materials, subcontracts, insurance and social security taxes and all special taxes that may be imposed by the State, in other words, all licenses, permits and taxes to be paid from this project except the United States Federal Income Tax only; freight and cartage, telephone and telegrams, hotel rooms or office at the job. Itemized transportation expenses which is definitely incurred in securing the award of any such contracts or

which are necessarily incurred in connection with the supervision of the job after award. Any equipment placed on the job is to be charged as expense at the prevailing rental rate in the locality of the job or job depreciation depending on which is the lesser. All expenditures made by the Minneapolis office such as freight, stamps and telephones directly in connection with the job that I am supervising will be charged against the job cost. This job will reimburse the Ring Construction Corporation offices and expenditures as outlined above. If the Ring Construction Corporation has other work that I have not estimated or for which I have not made prior agreements or executed same in writing, I will have no claim or any interest in such work that Ring Construction may have under construction."

When the Pittsburgh project was substantially completed the parties continued the employment under the contract of June 3, 1941, for the purpose of estimating and pricing a bid for a contract with the War Department of the United States for building and construction work at Camp McCoy, Sparta, Wisconsin, consisting of two related projects known as Areas C and E, and for superintending the work, if awarded to defendant. The defendant's bid was submitted about March, 26, 1942, and accepted by the War Department. Work on the project was commenced about April 1, 1942, and was completed about seven months later.

The contract price for material and labor for construction of the buildings on Area C was $3,986,000, and on Area E $2,664,280. Not long after work on the project began the Renegotiation Act of April 28, 1942, § 403, 56 Stat. 245, 50 U.S.C.A.Appendix, § 1191, became effective. This Act was construed by the War Department to apply to the defendant's contract for the work at Camp McCoy.

Thereafter a dispute arose between the parties in regard to the amount of estimating plaintiff had done in pricing defendant's bid. The controversy was settled about September 1, 1942, in anticipation of a renegotiation proceeding, and the provision for payment of plaintiff's compensation was changed by an agreement dated as of April 1, 1942, supplemental to the contract of June 3, 1941, supra. By the terms of the supplemental agreement the plaintiff agreed to devote his time and attention exclusively to the supervision of construction of Area C and to relinquish all his claims for compensation on Area E. The supplemental agreement further provided:

"(3) In consideration of the foregoing, and in consideration of the agreement of the second party, evidenced hereby, to devote his time and attention exclusively in the supervision of the work required in the performance and completion by the first party of its contract on the Camp McCoy project covering Area C, the first party does, by these presents, agree to pay to the second party, as compensation for his services, ten percent (10%) of the net profits earned by the first party in the performance of the portion of the Camp McCoy project included in Area C, as provided for in the employment agreement between the parties of June 3, 1941, aforesaid, and does further unconditionally guarantee the second party that the amount to be received by him on account of the portion of the profits earned by the first party in the performance of that portion of the Camp McCoy project included in Area C, computed in the manner and on the basis provided in the agreement between the parties of June 3, 1941, will be a sum at least equal to Thirty-five Hundred Dollars ($3,500.00) per month to the second party in manner following, to-wit:

"(a) $400 per month during the course of the construction of said Area C;

"(b) The balance upon the completion of said construction work.

\* \* \* \* \* \*

"(5) Except as herein expressly provided otherwise, all of the terms, covenants and conditions of the employment contract between the parties hereto of June 3, 1941, shall remain in full force and effect."

When the project was completed about November 1, 1942, it was accepted by the government and the full contract price was paid. On both Areas C and E the defendant received a profit of approximately $2,000,000, of which sum plaintiff concluded that $1,200,000 was attributable to

Area C. However, promptly upon completion of the work representatives of the government began proceedings for a redetermination of the contract price under the Renegotiation Act, supra. Both plaintiff and defendant participated in these proceedings, which resulted in the government demanding a reduction in the contract price and a return of the sum of $1,365,000 as excessive profits. Thereafter, pursuant to the provisions of the Act, the defendant filed a petition in the Tax Court of the United States to secure a judicial determination of its rights. In this action which is still pending the defendant raised the question of the reasonableness of the government's demand and of the constitutional validity of the Act as applied retroactively to the defendant's contract with the War Department which was entered into prior to the adoption of the Act.

The complaint alleges that plaintiff completely performed his duties and obligations under the contract of employment, supra; that there is due him from defendant 10% of the net profits earned by defendant in Area C of the Camp McCoy project in the amount of approximately $120,000 less the $24,500 received, representing the payments of $3,500 a month provided for in the contract, leaving unpaid approximately $95,500. The prayer of the complaint reads:

"Wherefore, plaintiff demands judgment:

"1. That defendant be required to account to plaintiff for the net profits earned by it upon said project, as defined in said 'Exhibit A', and for plaintiff's share thereof in accordance with the terms of said 'Exhibit B.'

"2. That defendant be ordered and required to produce its books of account and records upon the trial of this action and prior thereto, for inspection by plaintiff or his counsel or auditor.

"3. That plaintiff have and recover judgment against defendant for such amount as may be found to be due plaintiff from defendant on such accounting, together with interest as allowed by law.

"4. That plaintiff have and recover his costs and disbursements in this action.

"5. For such other and further relief as to the court may seem just and equitable in the premises."

In its answer the defendant admits the execution of the contract of June 3, 1941, and the supplement thereto of September, 1942, dated as of April 1, 1942; admits the service of plaintiff under the contracts in respect of Area C of the Camp McCoy project; and denies that the net profit was approximately $2,000,000, or that there became due the plaintiff approximately $120,000. The answer further alleges that the amount of the effective contract price of the work done by defendant on Areas C and E of the government project and the amount of the profits of the defendant are undeterminable until the litigation in the Tax Court is completed or by other litigation the constitutionality of the Renegotiation Act in its retroactive aspect is determined. It is also alleged that the term "full settlement" as used in the contract of June 3, 1941, to indicate the date and situation when net profits was determinable and plaintiff's share would be payable means that no part of the 10% of net profits was payable "until the so-called full settlement had actually and irrevocably been received by the defendant * * * so that the defendant could retain the full settlement as its own without condition; that such intention [of the parties] has been affirmed by the practical construction of the parties. * * *"

The answer alleged further that up to the time of the commencement of this action the plaintiff had acquiesced in defendant's claim (a) that no part of the plaintiff's share of the profits on Area C could be determined during the pendency of the renegotiation proceedings; (b) that no part of the profits now claimed by plaintiff had accrued during the pendency of the renegotiation proceedings; (c) that a settlement between the parties should be delayed until there had been a final determination of the contract price; and (d) that in accordance with the agreement it was the intention of the parties that the amount of profits which should be required to be returned to the War Department in connection with Area C should be deducted from the amount

received by defendant before calculating the share of the profits to which plaintiff was entitled.

Since it is conceded that the renegotiation proceeding is still pending and undecided, obviously the termination of the controversy depends upon the construction of the contract between the parties. Plaintiff's cause of action could not mature until the "net profits" of the defendant for the completion of the contract with the War Department was determinable according to the standard prescribed in the contract between the parties. The contract provided that "The monies arising from the profits will not become due to me until the work undertaken has been completed and accepted and *full settlement* is received by Ring Construction Corporation from the owner * * *" It was then provided that *"Net profits * * * is * * * agreed to be* the difference between the *contractors price* and the total cost of labor", etc., naming more than a dozen items constituting total cost. (Italics supplied).

■ The law is "that the terms of a contract, if it be ambiguous, are matters of fact to be determined in the same manner as other facts; by the jury, if it be a jury case, or by the court, if the jury be waived; while the construction of the contract and its legal effect are questions of law for the court." Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co., 8 Cir., 99 F.2d 902, 916; National Surety Corporation of New York v. Ellison, 8 Cir., 88 F.2d 399, 402; State v. Fellows, 98 Minn. 179, 187, 107 N.W. 542, 108 N.W. 825; Bell Lumber Co. v. Seaman, 136 Minn. 106, 161 N.W. 383, 384; Lucas v. Ganley Bros., 166 Minn. 7, 206 N.W. 934, 936.

■ It is the law, also, as the court observed in this case (66 F.Supp. 436, at page 438), that where ambiguity exists in a contract the construction the parties in their dealings and by their conduct have placed upon the terms will furnish the court with persuasive evidence of their meaning. 17 C.J.S., Contracts, § 325; City of South St. Paul v. Northern States Power Co., 189 Minn. 26, 248 N.W. 288, 291.

■■ Ordinarily, if the suit is merely for the recovery of money it is triable at law and a court of equity is without jurisdiction. Buzard v. Houston, 119 U.S. 347, 7 S.Ct. 249, 30 L.Ed. 451. However, "Courts of equity may have concurrent jurisdiction with courts of law; and in many legal situations the chancery court may make a decree simply for the payment of money * * * Furthermore, cases involving accounts form a class of which courts of equity have jurisdiction concurrent with courts of law." 19 Am.Jur., Equity, § 15; Wehrman v. Conklin, 155 U.S. 314, 15 S.Ct. 129, 39 L.Ed. 167. In Leighton v. Young, 8 Cir., 52 F. 439, 442, 18 L.R.A. 266, this court held that a case is one of equitable cognizance when the decree which should be rendered "depended upon the taking and stating of several accounts."

■ It is also the law, as the trial court concluded, that even though the taking of the case from the jury was error such error was without prejudice and the judgment must be affirmed provided the evidence was of such conclusive character that it would have been the duty of the court to direct a verdict for the defendant or to set aside the verdict had it been for the plaintiff. General Tire Co. v. Standard Acc. Ins. Co., 8 Cir., 65 F.2d 236, 239; Empire State Cattle Co. v. Atchison T. & S. F. Ry. Co., 210 U.S. 1, 28 S.Ct. 607, 52 L.Ed. 931, 15 Ann.Cas. 70.

■ In the federal court the scintilla rule does not apply. Where the evidence is "so overwhelmingly on one side as to leave no room to doubt what the fact is", the court should direct a verdict. Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 343, 53 S.Ct. 391, 77 L.Ed. 819; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

In order to apply these principles to the allegations of the pleadings and to the evidence in this case the historical order and development of the facts must be kept in mind. At the time defendant's bid was estimated for the construction of the Camp McCoy project in March, 1942, the parties could assume that the "net profits" on which plaintiff's compensation was to be based would be the difference between the bid, if accepted by the War Department, which was a definite and fixed sum, and the

total amount of all the items of cost enumerated in the contract, which amount was indefinite and would consist of many factors. After the enactment of the Renegotiation Act of April 28, 1942, supra, it was evident that if the Act were applicable to the construction contract then in process of performance the supposedly fixed "contractors price" would also be rendered uncertain until the renegotiation proceedings were concluded. It was evident, also, that if the term "net profits" as used in the contract, meant the amount realized by defendant after renegotiation, both parties were interested in the application of the Act. During the summer of 1942 while performance of the contract was in progress both parties, the evidence discloses, were concerned about the possible attempt of the War Department to "renegotiate" the contract and to reduce the contract price and recover the excess profits. This was one of the reasons stated for the making of the supplemental contract in September, 1942, and for dating it as of April 1, 1942.

Prior to the completion of the performance of the contract with the War Department no controversy arose in regard to the interpretation of the contract of employment between the parties. In fact no dispute arose on this point until this action was commenced. The first and only suggestion prior to that time that an ambiguity existed was made by the defendant. The plaintiff requested payment of the difference between $400 a month which had been paid to him during the course of construction of the project and the $3,500 per month provided for in the supplemental contract dated April 1, 1942. Replying to the request under date of October 8, 1942, the defendant called attention to the enactment by Congress of the Renegotiation Act of April 28, 1942, saying that "unfortunately" this legislation may "affect your position as well as the position of our company." The letter continued: "I [the president of the defendant company] do not feel that it is entirely fair to our company that we should assume any risk with respect to this matter, in so far as payment of compensation to you is concerned, and I am certain that you would not want us to take any such risk.

"Under the circumstances, I am prepared to authorize the payment to you at this time of the balance of the $3500.00 per month which you are entitled to receive under the employment contract with us, upon the following condition:

"In the event we are required to renegotiate our contract covering this project with the Government, and if, as a result of such renegotiation, the $3500.00 per month which has been paid to you is disallowed by the Government, in whole or in part, as a proper element of cost of the project in computing the profits which our company is entitled to receive thereon, then, and in such event, to the extent that the aggregate of such $3500.00 per month payments made to you is in excess of ten percent (10%) of the net profits earned by our company to which you are entitled under the provisions of your employment contract with us, you will reimburse our company for such excess, if any.

    \*     \*     \*     \*     \*     \*

"Upon your agreement to this condition, as evidenced by your signature subscribed to a counterpart of this communication, we are prepared to pay you the balance of the $3500.00 per month which you have requested.

> "Very truly yours,
> "Ring Construction Corporation
> "By M. J. Ring

"Accepted and Agreed to:
(signed) "M. A. Floyd
"10/10-42"

The plaintiff contends here as he did in the district court that the contract is not ambiguous. We think that after the enactment of the Renegotiation Act and the execution of the supplemental contract between the parties in 1942, there is sufficient warrant for doubt to justify the admission and consideration of evidence showing that plaintiff acquiesced in the construction claimed by defendant, contrary to the plaintiff's contention in this suit. For instance, the evidence shows that the defendant on November 30, 1942, offered to settle with the War Department and to modify the contract by reducing the contract price in the amount of $1,000,000. The following notation in handwriting was added to the second page

of the offer and signed by plaintiff: "The undersigned hereby approve and consent to the modification of the contract as hereinabove provided."

During 1943 and 1944 the plaintiff continued to seek settlement of his compensation, and the defendant took the position that the "net profits" and the amount payable could not be determined at that time. A voluminous correspondence ensued. The position of the defendant was expressed over and over in letters from the company and from its attorneys. Defendant's interpretation of the contract was concisely stated in a letter from defendant's attorneys to the plaintiff dated April 24, 1944, as follows: "Your compensation is governed by the profits realized by the company, and the latter are subject to redetermination under the renegotiation statute. It must be perfectly obvious to you that until those profits are finally determined and the renegotiation is completed, it is impossible to determine with finality the amount of your share."

In a letter to the defendant dated November 20, 1943, the plaintiff said: "I do not see why a settlement on my account cannot be made at this time up to the amount which the War Department is asking as a maximum return, namely, $1,360,000. I believe it is only fair and equitable that I ask for this settlement at this time * * * I believe we are both aware of the approximate amount of the profits and a settlement can be made on this basis at this time for tax purposes and a final account and settlement can be made after the renegotiations have been settled."

In all the negotiations and correspondence between the parties the plaintiff at no time disputed the interpretation placed upon the contract by the defendant until about the time this suit was commenced, but on the other hand he acquiesced therein as shown by his letter, supra. As late as June 13, 1944, he wrote, "I still feel and always shall feel that I am entitled to the share of my money, computed on the profit not in controversy with the War Board."

A further review of the evidence would extend this opinion unnecessarily. We are convinced that plaintiff's contentions are without merit. The construction placed upon the contract by the parties as shown by the evidence is a reasonable construction, and the court did not err in accepting that construction as a correct expression of their intention after the execution of the supplement thereto in September, 1942. That construction was strengthened and clarified by the further condition added in the correspondence of October 8, 1942, in reference to the payment of the difference between the $400 per month paid the plaintiff as the work progressed and the $3,500 per month agreed to be paid by the September supplement of the same year. These payments aggregating $24,500 were a part of plaintiff's 10% of the net profits.

 Whether the court erred in denying a jury trial is immaterial in view of our conclusion that the evidence conclusively establishes that it would have been the court's duty to direct a verdict for the defendant had the trial been to a jury. The record compelled the finding that the share of the "net profits" claimed by the plaintiff in this action did not accrue and was not payable during the pendency of the negotiation proceedings. The judgment dismissing the suit on the ground that it was prematurely brought must be and it is, therefore, affirmed.