

# THE ATTORNEY GENERAL

# OF TEXAS

**CRAWFORD C. MARTIN**
**ATTORNEY GENERAL**

AUSTIN, TEXAS 78711

December 5, 1969

Hon. Dorsey B. Hardeman
Executive Director
Texas Water Rights Commission
Sam Houston State Office Building
Austin, Texas 78711

Opinion No. M- 535

Re: Construction of Article
7466f, V.C.S., Pecos River
Compact between New Mexico
and Texas.

Dear Senator Hardeman:

Your letter requesting our opinion reads as follows:

Article 7466f, Vernon's Civil Statutes, details the terms of the Pecos River Compact between Texas and New Mexico. The Pecos River Compact Commissioner for Texas, Mr. R. B. McGowen, Jr. has requested the Water Rights Commission to make the necessary studies to determine the actual annual deliveries of water in the Pecos River to Texas by New Mexico since ratification of the Compact in 1948 and a comparison of actual annual deliveries with those specified in the terms of the Compact.

A number of opinions and interpretations on the Compact are needed prior to commencing the studies so that we may know what is meant by some of the terminology, how certain applications are to be made and the acceptability of some of the data.

At the time of ratification of the Compact certain engineering studies and data were adopted and incorporated by reference into the Compact. Article VI of the Compact contains the principles which govern in regard to the apportionment made in Article III and

-2546-

states that the inflow-outflow method, as described in the Report of the Engineering Advisory Committee, shall be used in the accounting of deliveries to state line. The Compact further adopts the 1947 conditions of the Pecos River Basin as the basis for making application of the inflow-outflow manual.

After the Compact was ratified and the Pecos River Commission began its administrative findings of facts, there arose some question as to whether or not the data as contained in the Report of the Engineering Advisory Committee did in fact reflect true 1947 conditions. As a result the Pecos River Commission authorized a review of the basic data and at its Twelfth Annual Meeting adopted the Report on Review of Basic Data to Engineering Advisory Committee, dated October 18, 1960, with certain appendixes thereto. This document set forth a 1947 condition materially different from that presented in the Report of the Engineering Advisory Committee adopted in the original Compact and ratified by legislative action.

The question of first importance then is:

"Did the Pecos River Commission in adopting the Report on Review of Basic Data to Engineering-Advisory Committee, dated October 18, 1960, act within its prescribed powers?"

A number of other questions pertaining to interpretations of the Compact are attached hereto.

Your specific first question is: Did the Pecos River Commission, in adopting the Report on a Review of Basic Data to Engineering Advisory Committee, dated October 18, 1960, act within its prescribed powers?

The answer to this question is found in the interpretation of the Pecos River Compact found and contained in Senate Docu-

ment 109. Prior to the adoption of this Compact, the engineers, attorneys and commissioners met on several occasions and discussed each proposed provision in detail. Records show one meeting in Austin, Texas on November 8-13, 1948 (p. 73-103, S.D. 109; and the final adopting meeting on December 3, 1948 in Santa Fe, New Mexico (p. 105-131, S.D. 109). One of the architects who construed and explained the provisions of the Compact was the Engineer Advisor to the Federal Representative, Mr. Royce J. Tipton, then of Denver, Colorado. He gave interpretation to each of the provisions in detail and those interpretations were adopted by the Commissioners in adopting each provision of the Compact; they are found in Senate Document 109. (Public Law 91, 81st Congress, Chapter 184, 1st Session, H.R. 3334).

This Document has also been copied and analyzed in "The Pecos River Commission-New Mexico and Texas, A Report of a Decade of Progress 1950-1960", compiled by Robert T. Lindle and Dee Linford. Page references in this memo hereafter refer to the Senate Document 109, and those in parenthesis refer to pages found in said volume, "A Report of a Decade of Progress."

Article II of the Pecos River Compact, paragraph (f) provides:

> "(f) The term "Report of the Engineering Advisory Committee" means that certain report of the Engineering Advisory Committee dated January, 1948, and all appendices thereto; including, basic data, processes, and analyses utilized in preparing that report, all of which were reviewed, approved, and adopted by the Commissioners signing this Compact at a meeting held in Santa Fe, New Mexico, on December 3, 1948, and which are included in the Minutes of that meeting."

Paragraph (g) provides:

> "(g) The term "1947 condition" means that situation in the Pecos River Basin as described and defined in the Report of the Engineering Advisory Committee.

In determining any question of fact here-
after arising as to such situation, ref-
erence shall be made to, and decisions
shall be based on, such report."

Paragraph (f) and (g) under Article II of the Compact
are explained by Mr. Tipton as follows:

"...(f) I believe has been defined. I
defined it in my explanation of the mat-
ters that were submitted to this meeting
from engineering advisory committee, and
suggested that the three volumes I de-
scribed and all work sheets be termed "Re-
port of the engineering advisory committee."

"I don't believe much explanation is
needed of item "(g)." I will give a short
one in order that there will not be con-
fusion. "1947 conditions" related to a
condition on the stream and does not re-
late to the water supply that occurred in
the year 1947. There may be some confusion
about that. There were certain conditions
that existed on the river, such as the di-
version requirements of the Carlsbad proj-
ect, which the engineering advisory com-
mittee assumed; the salt cedar consumption;
the reservoir capacities that existed in
1947; the operation of the Fort Sumner proj-
ect up to 6,500 acres; and the operation of
all other projects on the stream as they ac-
tually existed in 1947. It must be under-
stood that the term "1947 condition" relates
to the condition described in the report and
does not relate to the water supply that oc-
curred in the year 1947..." P. 113-114 S.D.
109 (p. 148-149, Report).

Mr. Tipton, at page 117 S.D. 109 (p. 153 Report), further
explains sub-paragraph (a) of Article III, which has a very
important bearing on the above questions:

"In my opinion, it would have been very
unwise for the commission to have set out
in this compact what might be called a

schedule. It would have been unwise for
several reasons. The commission may de-
vise, as time goes on, a better means to
determine this than by the inflow-outflow
method. It may perfect more nearly the
curves which appear in the engineering-
advisory committee report. We are having
difficulty now in regard to one compact
which involves three states, one of them
being the State of Texas, where we are
trying to change the schedule without chang-
ing rights and obligations. It appears that
we will have to go to the legislature to
change the schedule. The way the Pecos com-
pact is written, the commission has full au-
thority to change the method or to perfect
the technique, so long as what is done by
the commission is something directed at the
determination of the obligation under (a)."
(Emphasis ours.)

Then at page 125, S.D. 109 (p. 163 Report), Tipton refers
to findings of fact in explaining Article VI, which Article
ties to Article III. He makes it clear that the inflow-outflow
method was based on then available facts that determined the
"1947 conditions" as found by the Engineering Advisory Commit-
tee. Paragraphs (f) and (g) of Article II expressly define the
term "1947 condition" therefore, any change in the definition
of "1947 condition" should come by formal amendment of the Com-
pact. However written into the Compact are provisions to change
means, methods or devices for measuring water and paragraph (a)
of Article VI makes a further signed provision:

"(a) The Report of the Engineering Ad-
visory Committee, supplemented by additional
data hereafter accumulated, shall be used
by the Commission in making administrative
determinations."

In adopting the Articles, the explanations were specifi-
cally adopted along with each Article by vote of the Commis-
sioners. Therefore, it is the opinion of this office that the
Pecos River Commission has the authority to review the basic
data and to accept an Engineering Advisory Committee recalcu-
lation of that data. Such was clearly contemplated within the
adoption of the Compact.

The terms "compact" and "contract" are synonymous. 12 C.J. 217, Compact Note 73a; 17 C.J.S. 539, Contracts, Sec. 1 (1); and cases therein cited. A reasonable construction of an ambiguous contract by the parties thereto, although not conclusive, will be considered and accorded great weight, and usually will be adopted by the court. 17 C.J.S. 228, Contracts, Sec. 325 (1); Floyd v. Ring Const. Corp., 66 F.S. 436, 438, affirmed in 165 F.2d 125, and cert.den.92 L.Ed. 1763. Texas Courts follow the same rule. Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W.2d 566 (1949).

However, it must be pointed out that the October 18, 1960 Engineering Advisory Committee Report on review of basic data submitted to the Pecos River Commission was not a complete report. As late as January 26, 1967, the Engineering Advisory Committee made a status report of the inflow-outflow subcommittees to the Pecos River Commission; it is found on page 2 thereof:

> "The remaining work to be accomplished under the Commission's July 30, 1957 directive is: (1) Restudy under 1947 Conditions the inflow-outflow relationship for the reach of the Pecos River above Alamogordo Dam and (2) Review the January 1957 draft of the inflow-outflow manual and make recommendations for additional revisions which may be disclosed by its work."

(The July 30, 1957 directive was the one which appears to have authorized the restudy). It was at this July 30, 1957, 22nd (8th Annual) meeting of the Pecos River Commission at Santa Fe, New Mexico (reset in January to July, 1957) that the Commission adopted and authorized the following:

> "...3. A special subcommittee be created to restudy under 1947 conditions the inflow-outflow relationships for the reach of river above Alamogordo Dam and the reach of river from Alamogordo Dam to the New Mexico-Texas State line. The purpose of the restudy is to determine whether the relationship depicted by the curves appearing in pages 153 and 154 of Senate Document 109, 81st Congress, 1st Session, should be modified.

4. The last draft of the Inflow-Outflow
Manual be reviewed by the subcommittee
recommended under item 3 and, if necessary,
the subcommittee make recommendations for
additional revisions which may be disclosed
necessary by its work."

The Pecos River Compact minutes contain the above memo
dated January 26, 1967, from the Engineering Advisory Committee.

Again, as recently as January 23, 1969, a memorandum to
the Pecos River Commission from the Engineering Advisory Committee, Subject: Progress Report, sets out at page 3 thereof:

"The remaining work to be accomplished
under the Commission's July 30, 1957 di-
rective is: (1) Restudy under 1947 Con-
ditions the inflow-outflow relationship
for the reach of the Pecos River above
Alamogordo Dam and (2) Prepare inflow-out-
flow manual for Alamogordo Dam to stateline
reach for Commission consideration."

As far as we have been able to discover from the files
submitted to us, this study has never been completed and,
therefore, the report purportedly adopted by the 12th Annual
Meeting on January 19-31, at Roswell, New Mexico, was an in-
complete report. While the Commission had authority to accept
and adopt the 1960 Report, it accepted and adopted an incom-
plete restudy. However, this does not preclude a conclusion
of a recalculation or restudy; and it is our opinion that the
Commission acted within its prescribed powers in adopting the
Report on Review of Basic Data to Engineering Advisory Com-
mission, dated October 18, 1960.

Your request for an opinion also asks the following ad-
ditional eleven questions, which we will answer immediately
following each question:

1. Q. "Compact Article II(e): (1) Does
the term "deplete by man's activi-
ties" apply to diminishing of the
stream flow in the Pecos River by
pumping from underground waters
which would accrue to the flow in
the open channel of the Pecos if

> such waters were not removed by
> pumping?"

The answer is, Yes. Questions concerning the meaning of terms and provisions used in a Compact may be often resolved by reference to its legislative history. The Law and Use of Interstate Compacts, pp. 1-2, Zimmerman and Wendell (1961).

In the Pecos River Compact Commission Meeting, November 8-13, 1948, at Austin, Texas, Royce J. Tipton, at page 83, Senate Document 109, gave an explanation of (e) Article II of the Compact. In the meeting of the Pecos River Compact Commission on December 3, 1948, at Santa Fe, New Mexico, where the adopting took place, at pages 112-113, Senate Document 109 (p. 148 Report), further explanation is made by Tipton. In the first paragraph on page 113, he concludes:

> "...This term, therefore, goes to the
> effect upon the stream below a given point,
> as the result of man's activities in using
> waters of the Pecos River above such a
> point."

A month earlier, page 83, S.D. 109, he had specifically pointed out that excessive pumping was going on in the Roswell-Artesia region:

> "In some parts of the shallow ground-
> water area in the Roswell-Artesia region
> the pumping is exceeding the safe yield.
> If the pumping continues at its present
> rate, the entire base flow reaching the
> river from that area can be expected to
> be essentially depleted."

2.  Q. "Compact Article II(e): Is the loss of water through non-beneficial consumptive use by salt cedar over and above the "1947 Condition" to be borne by Texas, New Mexico or by both on a prorated basis?"

Answer: We are unable to answer question 2 because this point is not specifically covered by the provisions of the Compact. In Subsection (e) of Article II the following is provided:

"...For the purposes of this compact it
does not include the diminution of such
flow by encroachment of salt cedars or
other like growth, or by deterioration
of the channel of the stream."

Article IV contemplates cooperative work between the two
states in Subsection (a):

"New Mexico and Texas shall cooperate
to support legislation for the authori-
zation and construction of projects to
eliminate non-beneficial consumption of
water."


3.  Q.  "Compact Article II(g): Does the "1947
Condition" incorporate a specific measure
of the duty of water per acre irrigated?"

Answer:  No.

Page 113, Senate Document 109 (p. 148-149 Report), Mr.
Royce J. Tipton addresses himself to this provisio:

"I don't believe much explanation is
needed of item "(g)". I will give a
short one in order that there shall not
be confusion. "1947 condition" relates
to a condition on the stream and does not
relate to the water supply that occurred
in the year 1947. There may be some con-
fusion about that. There were certain con-
ditions that existed on the river, such as
the diversion requirements of the Carlsbad
project, which the engineering advisory
committee assumed; the salt cedar consump-
tion; the reservoir capacities that existed
in 1947; the operation of the Fort Sumner
project up to 6,500 acres; and the opera-
tion of all other projects on the stream
as they actually existed in 1947. It must
be understood that the term "1947 condi-
tion" relates to the condition described
in the report and does not relate to the

water supply that occurred in the year
1947."

References to "the duty of water" is not found in either
the report on engineering computations or in the explanation.
The nearest to the subject is an exchange between Tipton and
Miller found at page 91 of S.D. 109 (See Answer to Q. 11).

4. Q. "Compact Article II(h): Does the term
"water salvaged" exclude from apportion-
ment those waters regained for beneficial
consumptive use from eradication of salt
cedar which has encroached on the Pecos
River Basin subsequent to the "1947 con-
dition"?

Subparagraph (h) reads:

"The term "water salvaged" means that
quantity of water which may be recovered
and made available for beneficial use and
which quantity of water under the 1947
condition was non-beneficially consumed
by natural processes."

Article III, Subsection (c) provides that salvaged water
for beneficial consumptive use is apportioned forty-three per-
cent to Texas and fifty-seven percent to New Mexico, and Sec-
tion (d) in the same Article provides:

"Except as to water salvaged, appor-
tioned in paragraph (c) of this article,
the beneficial consumptive use of water
which shall be non-beneficially consumed,
and which is recovered, is hereby appor-
tioned to New Mexico but not to have the
effect of diminishing the quantity of water
available to Texas under the 1947 condition."

The next paragraph (e) provides:

"Any water salvaged in Texas is hereby
apportioned to Texas."

Then Royce Tipton addressed himself to this privision with this explanation at page 114, Senate Document 109 (p. 149 Report), as follows:

> "Subparagraph (h) defines "water sal-
> vaged" under the "1947 condition" that was
> being consumed by natural processes such
> as transpiration by salt cedars and like
> growth, and the evaporation of water from
> the river channels and tributaries. A
> certain amount of water which is nonbene-
> ficially consumed can be recovered by cer-
> tain means. An example of such means is
> the project which has been proposed to by-
> pass the salt cedars at the head of Lake Mc-
> Millan by a canal in order to reduce the a-
> mount of water available to those cedars to
> transpire. That project will bring some
> water back to the river that is now non-
> beneficially consumed. Such recovered water
> is what is meant by "water salvaged." The
> term, however, relates only to the quantity
> of water that was being nonbeneficailly con-
> sumed under the "1947 conditions." Any water
> salvaged up to the quantity of water that was
> being nonbeneficially consumed under the "1947
> condition" comes under the definition of "wa-
> ter salvaged."

The answer, therefore, is Yes. (See also Q. 7)


5. Q. "Compact Article II(i): Can a determ-
      ination of the specific measure of "un-
      appropriated flood waters" be made appli-
      cable to the compact and accounted for on
      a periodic basis?"

Mr. Tipton gives this explanation of unappropriated flood waters at page 114, S.D. 109 (p. 149 Report):

> "I believe that the term "Unappro-
> priated floodwaters" which appears in
> subparagraph (i) is plain. It means
> just what it says, viz: that any flood-
> water which is not now used in the basin
> above Girvin, Tex., is unappropriated
> floodwater, or water that would spill from

Hon. Dorsey B. Hardeman, page 12 (M- 535)

>Red Bluff Dam and would pass all the
present diversion and storage facili-
ities in Texas and flow unused past
Girvin, Tex.  That is what is meant by
unappropriated floodwater."

Article III(f) provides:

>"Beneficial consumptive use of unappro-
priated flood waters is hereby apportioned
fifty percent (50%) to Texas and fifty per-
cent (50%) to New Mexico."

Provided it is feasible from a water engineering stand-
point, the answer is, Yes.

6.  Q.  "Compact Article III(c): What is the basis
for the diversion of salvaged water forty-
three percent (43%) to Texas and fifty-seven
percent (57%) to New Mexico."

On page 99 of the Senate Document 109, a full discussion is
recorded.  During the bargaining stages of the Compact, New Mex-
ico suggested apportion of the water thirty-eight percent (38%)
to Texas, sixty-two percent (62%) to New Mexico.  Texas suggest-
ed forty-five percent (45%) to Texas and fifty-five percent (55%)
to New Mexico.  After considerable discussion Royce Tipton, page
100, S.D. 109, stated:

>"My suggestion, Mr. Chairman, is that the
States split the difference between those
two conditions which may have some signifi-
cance to the two States and make the alloca-
tion of salvaged water on that basis.  I think
that will come out just about 43 percent to the
State of Texas and 57 percent to the State of
New Mexico.  I'm merely making that as a sug-
gestion.  It doesn't depart very much from the
percentages which were used and there isn't too
much water involved.  It splits the difference
between the principle that might be applied on
the one side of the line and the principle that
might be applied on the other side of the line."

After a brief recess and conferences by the Texas and New
Mexico states, Mr. Miller for Texas stated:

>"Mr. Chairman, if it would be acceptable to
New Mexico, Texas is willing to accept Mr. Tip-
ton's suggestion of the 43 and 57 percent basis."

That was the final deliberation which set the stage to hold the meeting in Santa Fe on December 3, 1948, at which the Compact was accepted.

7. Q. "Compact Article III(d): What does this mean?"

Article III, Section (d) provides:

> "Except as to water salvaged, apportioned in paragraph (c) of this article, the beneficial consumptive use of water which shall be non-beneficially consumed, and which is recovered, is hereby apportioned to New Mexico but not to have the effect of diminishing the quantity of water available to Texas under the 1947 condition."

On page 118, S.D. 109 (p. 155 Report), Mr. Tipton interprets thus:

> "As I interpret (d), it has to do with two classes of water. The first class is water recovered by projects other than those mentioned in (c). The second class is the water recovered in excess of that which was being nonbeneficially consumed under the "1947 condition." Those two classes of water are apportioned to New Mexico with the provisio that in making such an apportionment the amount of water apportioned to Texas under (a) shall not be diminished. In other words the "1947 condition" shall be maintained except insofar as it might be changed by nature herself.

> "Subparagraph (e) apportions all water salvaged in Texas to Texas. That is self-explanatory.

> "Subparagraph (f) is self-explanatory. It apportions 50 percent of the unappropriated floodwaters to Texas and 50 percent to New Mexico."

This question ties into Question 4 above and would appear to give New Mexico an incentive to keep the channel of the Pecos clear of phreatophytes.

8. Q. "Compact Article IV(d): What is the effect of this?"

Article IV(d) provides:

"Neither New Mexico nor Texas will oppose the construction of any facil- ities permitted by this compact, and New Mexico and Texas will cooperate to obtain the construction of facil- ities that will be of joint benefit to the two states."

At page 120, S.D. 109 (p. 157 Report), Royce Tipton says that paragraph (d) is self-explanatory and we doubt that it could be made clearer, absent specific situations.

9. Q. "Compact Article VI(b): Can the Pecos River Commission change the period of accounting to a yearly basis?"

P. 124, S.D. 109 (p. 163 Report), Mr. Tipton states:

"Subparagraph (b) of Article VI states that unless otherwise determined by the Commission, depletion by man's activi- ities, State line flows, quantities of water salvaged, and quantities of un- appropriated floodwater shall be deter- mined on the basis of 3-year periods reckoned in continuing progressive series beginning with the first day of Jaunary next succeeding the ratification of the compact."

The answer is clearly, Yes.

Royce J. Tipton, page 124, Senate Document 109 (p. 163 Report), continues to explain:

"Then subparagraph (c) of Article VI states that the inflow-outflow method shall be used unless and until a more feasible method is devised....As time

goes on, if there were a progressive
change in that correlation from the one
shown on the curves in the engineering
advisory committee report, showing that
there was less water being delivered at
the State line that would indicate a
depletion. Then the commission would
have to determine the extent to which
that depletion was due to man's activ-
ities in New Mexico and the extent to
which it might be caused by nature.
That is a finding of fact. If caused
by man's activities, the commission
would notify the appropriate officials
of New Mexico."

Mr. Tipton makes several references to future findings of
fact. Subparagraphs (b) and (c) clearly set out that unless
otherwise determined by the Commission this be done. By in-
ference, therefore, the Commission could change the period of
accounting and the period of determination. (Page 124-125 of
Senate Document 109 (p. 163-164 Report).

10. Q. "Compact Article VI(c): Can this be
rewritten to substitute a firm schedule
of deliveries such as in the Rio Grande
Compact?"

Subparagraph (c) provides the answer:

"(c) Unless and until a more feasible
method is devised and adopted by the Com-
mission the inflow-outflow method, as de-
scribed in the Report of the Engineering
Advisory Committee, shall be used to:

(i) Determine the effect on the state-
line flow of any change in depletions by
man's activities or otherwise, of the wa-
ters of the Pecos River in New Mexico.

(ii) Measure at or near the Avalon Dam
in New Mexico the quantities of water sal-
vaged.

> (iii) Measure at or near the state
> line any water released from storage
> for the benefit of Texas as provided
> for in subparagraph (d) of this Art-
> icle.
>
> (iv) Measure the quantities of un-
> appropriated flood waters apportioned
> to Texas which have not been stored
> and regulated by reservoirs in New
> Mexico.
>
> (v) Measure any other quantities
> of water required to be measured under
> the terms of this Compact which are
> susceptible of being measured by the
> inflow-outflow method."

The answer is, Yes.

At page 117, of S.D. 109 (p. 153 Report), Royce Tipton explains.

> "In my opinion it would have been very
> unwise for the commission to have set out
> in this compact what might be called a
> schedule."

He then goes on to state:

> "It would have been unwise for several
> reasons. The commission may devise, as
> time goes on, a better means to determine
> this than by the inflow-outflow method.
> It may perfect more nearly the curves
> which appear in the engineering advisory
> committee report...The way the Pecos com-
> pact is written, the commission has full
> authority to change the method, or to per-
> fect the technique, so long as what is done
> by the commission is something directed at
> the determination of the obligation under
> (a)."

The two States put the provisos in Article VI in Subsec-
tion (b) as well as (c) that:

"Unless otherwise determined by the
commission...unless and until a more
feasible method is devised and adopted
by the Commission..."

It is evident that this part of the Compact can be re-
written to substitute a firm schedule of delivery similar to
such as is found in the Rio Grande Compact.


11.   Q.   "Compact Article VI(f): Can this be
           deleted by Pecos River Commission Ac-
           tion?"

Subparagraph (f) provides:

"Beneficial use shall be the basis, the
measure, and the limit of the right to use
water."

This provision is termed "shall", is a basic part of the
Compact, and it would take legislation to change it.  The an-
swer is, No.

On Page 91 of Senate Document 109, Commissioner Charles
H. Miller for Texas posed the question:

"Still, in working up a compact be
tween the two states we would have to
take into consideration the beneficial
use of the water?"

Mr. Tipton:

"That is correct."

Mr. Miller:

"And even if there was 295,000 acre-feet
came across the State line, we would have to
figure how much loss and how much benefit."

Mr. Tipton:

"That's correct, sir."

Mr. Miller:

"That Texas would derive from that in-
flow of water, isn't that right?"

Mr. Tipton:

"That's correct."

Mr. Miller:

"Likewise, New Mexico would have to do
the same thing."

Mr. Tipton:

"That's correct; yes, sir."

He proceeded further:

"That's right, and it is very probable that
from the engineering advisory committee's con-
clusions as to safe yield Texas, with her knowl-
edge of the irrigation practices below Red Bluff,
can determine the area that can be irrigated by
the water supply under each condition, Texas'
knowledge going not only to the question of chan-
nel losses but also the question of the extent
of reuse that can be made within the Texas area."

(This was actually the nearest that they came to talking
about duty of water).

Several other references to "beneficial use" are also
found in the adopting and explaining discussions.

## S U M M A R Y

The Pecos River Commission had the au-
thority to authorize and adopt the Report
on Review of Basic Data to Engineering
Advisory Commission dated October 18, 1960;

however, it was incomplete and should be concluded.

Questions concerning the meaning of terms and provisions used in the Compact may be resolved by reference to legislative history in Senate Document 109.

Very truly yours,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by Vince Taylor
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
George Kelton, Vice-Chairman

Houghton Brownlee
Alfred Walker
John Banks
Roland Allen
Roger Tyler

MEADE F. GRIFFIN
Staff Legal Assistant

NOLA WHITE
First Assistant